## SHAW *v.* RAILROAD COMPANY.

1. Statutes are not to be construed as altering the common law, or as making any innovation therein, further than their words import.
2. Although a statute makes bills of lading negotiable by indorsement and delivery, it does not follow that all the consequences incident to the indorsement of bills and notes before maturity ensue or are intended to result from such negotiation.
3. The rule that a *bona fide* purchaser of a lost or stolen bill or note indorsed in blank or payable to bearer is not bound to look beyond the instrument, has no application to the case of a lost or stolen bill of lading.
4. The purchaser of a bill of lading who has reason to believe that his vendor was not the owner thereof, or that it was held to secure an outstanding draft, is not a *bona fide* purchaser, nor entitled to hold the merchandise covered by the bill against its true owner.
5. Where the judgment below was entered properly, this court will not remand the case for a new trial because of the verbal mistake of the clerk in using a superfluous word in entering the verdict.  As the verdict was amendable in the court below, the amendment will be regarded as made.

ERROR to the Circuit Court of the United States for the Eastern District of Pennsylvania.

This is an action of replevin brought by the Merchants' National Bank of St. Louis, Missouri, against Shaw & Esrey, of Philadelphia, Pennsylvania, to recover possession of certain cotton, marked " W D I."   One hundred and forty-one bales thereof having been taken possession of by the marshal were returned to the defendants upon their entering into the proper bond.   On Nov. 11, 1874, Norvell & Co., of St. Louis, sold to the bank their draft for $11,947.43 on M. Kuhn & Brother, of

Philadelphia, and, as collateral security for the payment thereof indorsed in blank and delivered to the bank an original bill of lading for one hundred and seventy bales of cotton that day shipped to the last-named city. The duplicate bill of lading was on the same day forwarded to Kuhn & Brother by Norvell & Co. The Merchants' Bank forwarded the draft, with the bill of lading thereto attached, to the Bank of North America. On November 14, the last-named bank sent the draft — the original bill of lading still being attached thereto — to Kuhn & Brother by its messenger for acceptance. The messenger presented the draft and bill to one of the members of that firm, who accepted the former, but, without being detected, substituted the duplicate for the original bill of lading.

On the day upon which this transaction occurred, Kuhn & Brother indorsed the original bill of lading to Miller & Brother, and received thereon an advance of $8,500. Within a few days afterwards, the cotton, or rather that portion of it which is in controversy, was, through the agency of a broker, sold by sample with the approval of Kuhn & Brother to the defendants, who were manufacturers at Chester, Pennsylvania. The bill of lading, having been deposited on the same day with the North Pennsylvania Railroad Company, at whose depot the cotton was expected to arrive, it was on its arrival delivered to the defendants.

The fact that the Bank of North America held the duplicate instead of the original bill of lading was discovered for the first time on the 9th of December, by the president of the plaintiff, who had gone to Philadelphia in consequence of the failure of Kuhn & Brother and the protest of the draft.

The defendants below contended that the bill of lading was negotiable in the ordinary sense of that word; that Miller & Brother had purchased it for value in the usual course of business, and that they thereby had acquired a valid title to the cotton, which was not impaired by proof that Kuhn & Brother had fraudulently got possession of the bill; but the court left it to the jury to determine, —

1st, Whether there was any negligence of the plaintiff or its agents in parting with possession of the bill of lading.

2d, Whether Miller & Brother knew any fact or facts from

which they had reason to believe that the bill of lading was held to secure payment of an outstanding draft.

The jury having found the first question in the negative and the second in the affirmative, further found " the value of the goods eloigned " to be $7,015.97, assessed the plaintiff's damages at that sum with costs, for which amount the court entered a judgment. Shaw & Esrey thereupon sued out this writ of error.

The remaining facts are stated in the opinion of the court.

*Mr. James E. Gowen* for the plaintiffs in error.

The original bill of lading was a negotiable instrument. By its indorsement, while the cotton was in transit to Miller & Brother for a valuable consideration, and without notice of any defect in the title of Kuhn & Brother, they acquired a valid title to the goods.

When the Merchants' National Bank of St. Louis took the bill of lading, Missouri was the place in which the contract was made, — the place in which the property was actually situated, — and it was the domicile of all the contracting parties. There can be no doubt, therefore, that the legal effect of the bill was, for the time being, at least determinable by the law of that State. *Scudder* v. *Union National Bank*, 91 U. S. 406; *Peninsular and Oriental Steamship Co.* v. *Shand*, 3 Moo. P. C. C. N. S. 272; *McDaniels* v. *Chicago & Northwestern Railway Co.*, 24 Iowa, 412; *First National Bank of Toledo* v. *Shaw*, 61 N. Y. 283; *Henry* v. *Philadelphia Warehouse Co.*, 81 Pa. St. 76; *Ory* v. *Winter*, 4 Mart. N. S. (La.) 277; *Slacum* v. *Pomery*, 6 Cranch, 221; *De la Chaumette* v. *Bank of England*, 2 Barn. & Adol. 385; *Trimbey* v. *Vignier*, 1 Bing. N. C. 151; *Lebee* v. *Tucker*, Law Rep. 3 Q. B. 77; *Robertson* v. *Burdekin*, 1 Ross, L. C. 559; Story, Confl. of Laws, sect. 263; Wharton, Confl. of Laws, sects. 452, 453, 454, 471.

The bill of lading in the hands of Miller & Brother, even if its effect were determinable by the law of Pennsylvania, would be a negotiable instrument. The statute of that State expressly enacts that warehouse receipts or bills of lading shall be negotiable. It is a familiar principle that technical words in a statute are to be taken in a technical sense, unless it appears that they were intended to be applied differently from

their ordinary or legal acceptation. *United States* v. *Jones,* 3 Wash. 209; *United States* v. *Wilson & Peters,* Baldw. 78; *McCool* v. *Smith,* 1 Black, 459.

" 'Negotiable' and 'negotiability' signify that an instrument is capable of being transferred so as to be free from any questions between original parties, the quality of being vendible by commercial indorsement." Abbott's Law Dictionary.

It is necessary to inquire, then, whether there is any thing in the act which denotes an intent to use the word " negotiable " in its ordinary legal sense. An examination shows that the legislature had in view the ordinary meaning of the word. The act provides that bills of lading and warehouse receipts may be transferred by " indorsement and delivery," thus using a term applicable solely to the transfer of negotiable instruments. The proviso to the first section enacts that all warehouse receipts or bills of lading having the words " not negotiable " plainly written or stamped on the face thereof shall be exempt from the provisions of the act. The proviso would be unmeaning, if the object of the act was not to make bills of lading actually negotiable instead of merely assignable, since it must be presumed that " negotiable " is used in the same sense in the proviso as in the body of the section.

Moreover, it should not be assumed that the object in passing the act was to impart to bills of lading the quality of assignability when by the common law they already had that quality to the fullest extent.

In a number of the States, statutes were passed at an early period for the purpose of making promissory notes negotiable instruments. Many of them resembled the Missouri statute in the present case, in superadding the words " like bills of exchange." Thus the statute of New York provided that " all notes in writing . . . shall be negotiable in like manner as inland bills of exchange." But in many of the States all such words were omitted. Thus in Virginia the statute enacted that " every promissory note or check for money payable in this State at a particular bank . . . and every inland bill of exchange payable in this State shall be deemed negotiable." Code of Virginia (edition of 1860), p. 629. Yet certainly no one would contend that the omission of the words " like bills

of exchange" in some of these statutes rendered promissory notes negotiable in some other sense than bills of exchange were negotiable.

The fact that Miller & Brother knew any fact or facts from which they had reason to believe that the bill of lading was held to secure payment of an outstanding draft does not invalidate their title, — *mala fides* on their part must be shown. *Goodman* v. *Simonds*, 20 How. 343; *Murray* v. *Lardner*, 2 Wall. 110. *Phelan* v. *Moss* (67 Pa. St. 59) holds that a *bona fide* holder for value of a negotiable note without notice can recover upon it, notwithstanding he took it under circumstances which ought to have excited the suspicions of a prudent man, and that, in order to destroy his title, his taking the note *mala fide* must be shown.

The court erred in entering a judgment upon the verdict which found, not the value of the goods which had been replevied, but the value of those which been eloigned. This was a palpable error, but at the same time it is not pretended that it was any thing but the consequence of an unnoticed mistake in entering the verdict. The difficulty, however, is that the record, as it now stands, shows a judgment relating not to the property in actual controversy, but to that with which the defendants had nothing to do. They therefore have a right to complain of the insufficiency of the record, in not showing their discharge from responsibility for the cotton which really formed the subject-matter of this suit.

*Mr. Robert N. Willson* and *Mr. George Junkin, contra.*

MR. JUSTICE STRONG delivered the opinion of the court.

The defendants below, now plaintiffs in error, bought the cotton from Miller & Brother by sample, through a cotton broker. No bill of lading or other written evidence of title in their vendors was exhibited to them. Hence, they can have no other or better title than their vendors had.

The inquiry, therefore, is, what title had Miller & Brother as against the bank, which confessedly was the owner, and which is still the owner, unless it has lost its ownership by the fraudulent act of Kuhn & Brother. The cotton was represented by the bill of lading given to Norvell & Co., at St. Louis, and by

them indorsed to the bank, to secure the payment of an accompanying discounted time-draft. That indorsement vested in the bank the title to the cotton, as well as to the contract. While it there continued, and during the transit of the cotton from St. Louis to Philadelphia, the endorsed bill of lading was stolen by one of the firm of Kuhn & Brother, and by them indorsed over to Miller & Brother, for an advance of $8,500. The jury has found, however, that there was no negligence of the bank, or of its agents, in parting with possession of the bill of lading, and that Miller & Brother knew facts from which they had reason to believe it was held to secure the payment of an outstanding draft; in other words, that Kuhn & Brother were not the lawful owners of it, and had no right to dispose of it.

It is therefore to be determined whether Miller & Brother, by taking the bill of lading from Kuhn & Brother under these circumstances, acquired thereby a good title to the cotton as against the bank.

In considering this question, it does not appear to us necessary to inquire whether the effect of the bill of lading in the hands of Miller & Brother is to be determined by the law of Missouri, where the bill was given, or by the law of Pennsylvania, where the cotton was delivered. The statutes of both States enact that bills of lading shall be negotiable by indorsement and delivery. The statute of Pennsylvania declares simply, they "shall be negotiable and may be transferred by indorsement and delivery;" while that of Missouri enacts that "they shall be negotiable by written indorsement thereon and delivery, *in the same manner* as bills of exchange and promissory notes." There is no material difference between these provisions. Both statutes prescribe the manner of negotiation; *i. e.*, by indorsement and delivery. Neither undertakes to define the effect of such a transfer.

We must, therefore, look outside of the statutes to learn what they mean by declaring such instruments negotiable. What is negotiability? It is a technical term derived from the usage of merchants and bankers, in transferring, primarily, bills of exchange and, afterwards, promissory notes. At common law no contract was assignable, so as to give to an assignee a

right to enforce it by suit in his own name. To this rule bills of exchange and promissory notes, payable to order or bearer, have been admitted exceptions, made such by the adoption of the law merchant. They may be transferred by indorsement and delivery, and such a transfer is called negotiation. It is a mercantile business transaction, and the capability of being thus transferred, so as to give to the indorsee a right to sue on the contract in his own name, is what constitutes negotiability. The term " negotiable " expresses, at least primarily, this mode and effect of a transfer.

In regard to bills and notes, certain other consequences generally, though not always, follow. Such as a liability of the indorser, if demand be duly made of the acceptor or maker, and seasonable notice of his default be given. So if the indorsement be made for value to a *bona fide* holder, before the maturity of the bill or note, in due course of business, the maker or acceptor cannot set up against the indorsee any defence which might have been set up against the payee, had the bill or note remained in his hands.

So, also, if a note or bill of exchange be indorsed in blank, if payable to order, or if it be payable to bearer, and therefore negotiable by delivery alone, and then be lost or stolen, a *bona fide* purchaser for value paid acquires title to it, even as against the true owner. This is an exception from the ordinary rule respecting personal property. But none of these consequences are necessary attendants or constituents of negotiability, or negotiation. That may exist without them. A bill or note past due is negotiable, if it be payable to order, or bearer, but its indorsement or delivery does not cut off the defences of the maker or acceptor against it, nor create such a contract as results from an indorsement before maturity, and it does not give to the purchaser of a lost or stolen bill the rights of the real owner.

It does not necessarily follow, therefore, that because a statute has made bills of lading negotiable by indorsement and delivery, all these consequences of an indorsement and delivery of bills and notes before maturity ensue or are intended to result from such negotiation.

Bills of exchange and promissory notes are exceptional in

their character. They are representatives of money, circulating in the commercial world as evidence of money, " of which any person in lawful possession may avail himself to pay debts or make purchases or make remittances of money from one country to another, or to remote places in the same country. Hence, as said by Story, J., it has become a general rule of the commercial world to hold bills of exchange, as in some sort, sacred instrument in favor of *bona fide* holders for a valuable consideration without notice." Without such a holding they could not perform their peculiar functions. It is for this reason it is held that if a bill or note, endorsed in blank or payable to bearer, be lost or stolen, and be purchased from the finder or thief, without any knowledge of want of ownership in the vendor, the *bona fide* purchaser may hold it against the true owner. He may hold it though he took it negligently, and when there were suspicious circumstances attending the transfer. Nothing short of actual or constructive notice that the instrument is not the property of the person who offers to sell it; that is, nothing short of *mala fides* will defeat his right. The rule is the same as that which protects the *bona fide* indorser of a bill or note purchased for value from the true owner. The purchaser is not bound to look beyond the instrument. *Goodman* v. *Harvey*, 4 Ad. & E. 870; *Goodman* v. *Simonds*, 20 How. 343; *Murray* v. *Lardner*, 2 Wall. 110; *Matthews* v. *Poythress*, 4 Ga. 287. The rule was first applied to the case of a lost bank-note (*Miller* v. *Race*, 1 Burr. 452), and put upon the ground that the interests of trade, the usual course of business, and the fact that bank-notes pass from hand to hand as coin, require it. It was subsequently held applicable to merchants' drafts, and in *Peacock* v. *Rhodes* (2 Doug. 633), to bills and notes, as coming within the same reason.

The reason can have no application to the case of a lost or stolen bill of lading. The function of that instrument is entirely different from that of a bill or note. It is not a representative of money, used for transmission of money, or for the payment of debts or for purchases. It does not pass from hand to hand as bank-notes or coin. It is a contract for the performance of a certain duty. True, it is a symbol of ownership of the goods covered by it, — a representative of those goods. But if the

goods themselves be lost or stolen, no sale of them by the finder or thief, though to a *bona fide* purchaser for value, will divest the ownership of the person who lost them, or from whom they were stolen. Why then should the sale of the symbol or mere representative of the goods have such an effect? It may be that the true owner by his negligence or carelessness may have put it in the power of a finder or thief to occupy ostensibly the position of a true owner, and his carelessness may estop him from asserting his right against a purchaser who has been misled to his hurt by that carelessness. But the present is no such case. It is established by the verdict of the jury that the bank did not lose its possession of the bill of lading negligently. There is no estoppel, therefore, against the bank's right.

Bills of lading are regarded as so much cotton, grain, iron, or other articles of merchandise. The merchandise is very often sold or pledged by the transfer of the bills which cover it. They are, in commerce, a very different thing from bills of exchange and promissory notes, answering a different purpose and performing different functions. It cannot be, therefore, that the statute which made them negotiable by indorsement and delivery, or negotiable *in the same manner* as bills of exchange and promissory notes are negotiable, intended to change totally their character, put them *in all respects* on the footing of instruments which are the representatives of money, and charge the negotiation of them with all the consequences which usually attend or follow the negotiation of bills and notes. Some of these consequences would be very strange if not impossible. Such as the liability of indorsers, the duty of demand *ad diem*, notice of non-delivery by the carrier, &c., or the loss of the owner's property by the fraudulent assignment of a thief. If these were intended, surely the statute would have said something more than merely make them negotiable by indorsement. No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express. Especially is so great an innovation as would be placing bills of lading on the same footing in all respects with bills of exchange not to be inferred from words that can be fully satisfied without it. The law has

most carefully protected the ownership of personal property, other than money, against misappropriation by others than the owner, even when it is out of his possession. This protection would be largely withdrawn if the misappropriation of its symbol or representative could avail to defeat the ownership, even when the person who claims under a misappropriation had reason to believe that the person from whom he took the property had no right to it.

We think, therefore, that the rule asserted in *Goodman* v. *Harvey*, *Goodman* v. *Simonds*, *Murray* v. *Lardner* (*supra*), and in *Phelan* v. *Moss* (67 Pa. St. 59), is not applicable to a stolen bill of lading. At least the purchaser of such a bill, with reason to believe that his vendor was not the owner of the bill, or that it was held to secure the payment of an outstanding draft, is not a *bona fide* purchaser, and he is not entitled to hold the merchandise covered by the bill against its true owner. In the present case there was more than mere negligence on the part of Miller & Brother, more than mere reason for suspicion. There was reason to believe Kuhn & Brother had no right to negotiate the bill. This falls very little, if any, short of knowledge. It may fairly be assumed that one who has reason to believe a fact exists, knows it exists. Certainly, if he be a reasonable being.

This disposes of the principal objections urged against the charge given to the jury. They are not sustained. The other assignments of error are of little importance. We cannot say there was no evidence in the case to justify a submission to the jury of the question whether Miller & Brother knew any fact or facts from which they had reason to believe that the bill of lading was held to secure payment of an outstanding draft. It does not appear that we have before us all the evidence that was given, but if we have, there is enough to warrant a submission of that question.

The exceptions to the admission of testimony, and to the cross-examination of Andrew H. Miller, are not of sufficient importance, even if they could be sustained, to justify our reversing the judgment. Nor are we convinced that they exhibit any error.

There was undoubtedly a mistake in entering the verdict. It

was a mistake of the clerk in using a superfluous word. The jury found a general verdict for the plaintiff. But they found the value of the goods " eloigned " to have been $7,015.97. The word " eloigned " was inadvertently used, and it might have been stricken out. It should have been, and it may be here. The judgment was entered properly. As the verdict was amendable in the court below, we will regard the amendment as made. It would be quite inadmissible to send the case back for another trial because of such a verbal mistake.

*Judgment affirmed.*