The opinion of the court was delivered by
Watkins, J.
This is a controversy arising over the proceeds of fifty bales of cotton which J. Y. Webb shipped, by rail, from Minden, Louisiana, to J. B. Lallande, of New Orleans, and therefor issued bills of lading to the consignee, and which he pledged to the Whitney National Bank for a loan of $2100.
Webb claims ownership of the cotton, and avers that it was consigned to Lallande, as his factor, for sale, and that he was without right or authority to pledge it as he did. The bank claims that it made the loan to Lallande on the faith of the bills of lading which Webb issued to Lallande as consignee.
The contention of the bank is (1) that the bills were unqualified by *707 any restriction, and that the cotton covered by them was owned by Lallande, and that it acted on the faith of his ownership in making the loan; that, at the time of said loan, Lallande was a merchant in good standing and of high credit, and it acted in good faith and without any knowledge or suspicion of any rights or equities in favor of Webb; (2) that, under said bills of lading, the pledge was valid and binding,- under the express provisions of Sections 2482 and 2485 of the Revised Statutes; (8) that Webb, having taken out such bills of lading, and thus consigned the cotton to Lallande, placed a written title in his hands and enabled him to hold himself out to the world as owner and to deal with it as such, and he is thereby estopped from setting up any rights of his own as opposed to its rights of pledge.
On these issues the ease went to trial, and there was judgment in favor of plaintiff in rule, and the bank has appealed.
A fair summary of the facts of the case is as follows, viz:
On the 20th of January, 1890, the Minden Railroad issued to J. Y. Webb two receipts of the following form, viz:
“Minden, La., January 20, 1890.
“Received from J. Y. Webb, Sr., thirty-eight bales of compressed cotton, in good order, consigned to J. B. Lallande, New Orleans.
“Through rate, $1.90 per bale.
department delivery.
Bales. Marts. Numbers.
28 Y. V. Y. 1-28
“ Charges, $27.04.
“Received, January 29, 1890.
“28 Total.
“ To be transported over the Minden Railroad to Minden Junction. Liability to the Minden Railroad and Oompress Company to cease when the cotton is delivered to the Yicksburg, Shreveport & Pacific Railroad. Roger T. Boyle, Agent.”
There is another bill of like tenor for twenty-two bales. Lallande assigned both bills of lading to the bank, on the 24th of January, 1890, as a pledge for a personal loan, on his own endorsement. Three days subsequently he failed in business and took the benefit of the insolvent law. Subsequently, on the arrival of the cotton in New Orleans, Webb sequestered it in the hands of the railroad company, and the provisional syndic was ordered to surrender it. But upon *708 being met with the claim of the bank, as pledgee, an agreement was entered into whereby the cotton should be sold and the contest carried on over the proceeds.
. The cotton is the property of Webb, who shipped it by rail to Lallande, consignee, as his cotton factor and commission merchant, in the customary and usual course of their dealings for many years. Lallande had been engaged in that business for many years in the city of New Orleans, where the Whitney bank was also engaged in business. At the date of these transactions, Webb was not indebted to Lallande; on the contrary, the latter’s books showed a.credit balance, in the former’s favor, of just 56 cents. When the bankmade the loan to Lallande, he was well and favorably known to the officers of the bank “as a merchant in good standing and of high credit.” When he requested a loan on the bills of lading, no questions were asked him, touching his solvency, or his ownership of the cotton covered by them.
The president of the bank, in the course of his statement of the transaction, said he had known Lallande for six years, during which time he did a large business, and in respect to his credit with the bank he said “ no man stood better.”
In the course of his interrogatories as a witness, the following transpired, viz:
Q. “Prom what fact did you assume that Lallande was the owner of the cotton?
A. “Well, the bills of lading. This cotton was consigned.to J. B. Lallande; under the bills of lading, endorsed, J. B. Lallande. Without asking any questions, I supposed that this was cotton which belonged to Mr. Lallande, consigned to him for payment, before the cotton was delivered, and that the proceeds would be put to the payment of the notes.
Q. “Then it was the bills of lading which made you believe the cotton was Lallande’s?
A. “Yes, sir.
Q. “Did you make any inquiries to find out if Mr. Lallande was the owner of the cotton?
A. “No, sir; I considered the factof his cmving there that the thing was all right.
*709 Q,. “If you knew a man by sight, and nothing at all about his standing and solvency, would you have loaned him the money (on such bills)?
A. “No, sir.”
Then we have the following points established, viz:
1. That Webb was, at date of shipment of the cotton; the owner, and made shipment to Lallande, as his commission merchant and cotton factor, in the city of New Orleans, where both Lallande and the bank resided, and were engaged in business.
2. That Lallande’s business as a merchant was well known to the officers of the bank, and he was personally well and favorably known to them “as a merchant of good standing and of high credit.”
3. That the bills of lading were executed in the form of receipts by the agent of the carrier in favor of Webb, as the shipper alone, and not to order or bearer, and therein Lallande was named as consignee. The bills were not signed or endorsed by Webb, and in order to effect his pledge to the bank, Lallande, for himself, endorsed same in blank.
4. At the time of the shipment of the cotton, and the reception of the bills of lading by Lallande, he was not the creditor of Webb for a cent, and he was not, at the time he executed the pledge to the bank.
5. When Lallande requested a loan of the bank, and these bills of lading, unendorsed by Webb, were tendered as security, the officers of the bank accepted them without question, on their own supposition that the cotton that was covered by them belonged to Lallande.
It is perfectly manifest that, on this showing, Lallande had no right or authority to make a pledge of Ms customer’s bills of lading as security for his personal debt. The law provides “that when a merchant, or factor or other person has advanced money, property or supplies on cotton, etc., '* * * and the same has been consigned to him by ship, steamboat, vessel, railroad or other carrier, the said agricultural products- shall be pledged to the consignee thereof, from the time the bill of lading thereof shall be put in the mail, or put into the possession of the carrier for transportation to the consignee, and the right of pledge shall be perfect, with the right of sale of said property, which shall be fully vested in said consignee, with a right to appropriate the proceeds to the payment of the *710 amount due him for such advances as may have been made thereon. ” Sec. 2, Act 66 of 1874.
This statute states the exact relations which subsist in this State between any shipper and the merchant or factor to whom he has consigned any agricultural products by a carrier, and for which the latter has executed a bill of lading. It confers upon the latter solely and exclusively the right of sale.
Under the Civil Code a debtor may give in pledge whatever belongs to him (R. C. O. 3142), but he can not pledge for his own debt the property of another without the express or tacit consent of the owner; and if the consent be tacit, “ it must be inferred from circumstances so strong as to leave no doubt of the owner’s intention, as if he was present at the making of the contract, or if he himself delivered to the creditor the thing pawned.” R. C. C. 3146.
Chancellor Kent, in his comprehensive treatment of this question, says of the relations of principal and factor:
/' “ Though a factor may sell and bind his principal, he can not pledge the goods as a security for his own debt, even though there be the formality of a bill of parcels and a receipt. The principal may recover the goods of the pawnee, and his ignorance that the factor held the goods in the character of factor is no excuse.
“ The doctrine that a factor can not pledge is sustained so strictly that it is admitted he can not do it by endorsement and delivery of the bill of lading any more than by delivery of the goods themselves. To pledge the goods of the principal is beyond the scope of the factor’s power; and every attempt to do it under the color of a sale is tortious and void.” 2 Kent, p. 626.
In confirmation of this principle this court has frequently held that the factor can not pledge property consigned to him.
In Hadwin vs. Fisk, 1 An. 74, our predecessors said:
“ On the question of law the doctrine is well settled that the factor can not pledge for his own debts property consigned to him, nor can he give it in payment of his own debts.”
The same was announced in Bonnot vs. Fuentes, 10 An. 70.
In Young vs. Scott & Cage, 25 An. 313, the court said:
“ This court has frequently decided that the factor can not pledge or give in payment of his own debts property entrusted to him for sale.” 17 La. 166; 1 An. 74; 19 — 3000.
*711 In Allen vs. Bank, 120 U. S. 20, the Supreme Court expressed its approval of this doctrine thus:
“By the common law a factor or agent for sale has no power to pledge, whether the owner has intrusted him with the possession of the goods themselves or with the symbols of them, as by consigning them to him by a bill of lading in which he is consignee or endorsee; ’ ’ .quoting Kent with approval.
But it is contended in this case that the bills of lading were en-\ ■ dorsed, and, therefore, the bank was authorized to accept them in pledge, as it would have accepted other commercial paper.
But it is necessary that we should take into consideration the character and incidents of a bill of lading, and ascertain to what extent they are negotiable and in what manner they may become so.
Kent defines a bill of lading to be “ a receipt for the conveyance of the cargo of a carrier; and, though it is signed by the master, he does it as the agent of the owner, and it is a contract binding upon them. By the bill of lading the master engages, as a common carrier, to carry and deliver the goods to the consignee, or Ms order. * * * “ It is the document and title of the goods sent; and, as such, if it be to order, or assigns, is transferable in market. The endorsement and delivery of it transfers the property in the goods from the date of delivery.” 3 Kent 207. " *"
Therefore, the bills of lading issued by the railroad company to\ Webb, as the shipper, primarily evidenced his title. They are in the i name of Webb alone, and not of the bearer or order. The goods were not deliverable to Lallande or order, or assigns, but to him in-| dividually. The provisions of the Act of 1868 on this subject are that:
“ Any bill of lading given by any forwarder, boat, railroad, transportation or transfer company, may be transferred by endorsement therein, and any person to whom the same may be transferred, shall be claimed and taken to be the owner of the goods, wares, merchandise, grain, flour or other produce, or commodity therein specified, so far as to give validity to any pledge, lien or transfer made, or created by sueh person or persons,” etc. Sec. 6, Act 150 of 1868.
But as Lallande alone was named as the consignee in the bills of lading and the goods were not thereunder deliverable to his order or to his assigns, his endorsement operated only as an assignment of them to the bank.
*712 But in any event, an endorsement of a bill of lading has not a like feffect as the endorsement of bills and notes.
In the ease of Shaw vs. Railroad Co., 101 U. S. 557, the Supreme Court considered the effect of an endorsement of a bill of lading which was made under a similar act to that of 1868, and they said :
“ It does not nece'ssarily follow, therefore, that because a statute has made bills of lading negotiable by endorsement and delivery, all the consequences of an endorsement and delivery of bills and notes before maturity ensue, or are intended to result from such negotiafcion * * * * * * * * * * *
“ The function of that instrument is entirely different from that of a bill or note. It is not a representative of money, used for the transmission of money, or for the payment of debts or purchases. It does not pass from hand to hand, as bank notes or coin. It is a contract for the performance of a certain duty. True, it is symbolical of ownership of the goods covered by it — a representative of the goods. But if the goods themselves be lost or stolen, no sale of them by the finder or thief, though to a bona fide purchaser for value, will divest the ownership of the person who lost them, or from whom they were stolen. Why then should the sale of the symbol or mere representative of the goods have such effect?”
This the court held not to be the case, and said further:
“No statute is to be construed as altering the common law, further than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express. Especially is so great an innovation as would be placing bills of lading on the same footing in all respects with bills of exchange, not to be inferred from words that can be fully satisfied without it. The law has most carefully protected the ownership of personal property, other than money, against misappropriation, by others than the owner, even when it is out of his possession. This protection would- be largely withdrawn, if the misappropriation of its symbol, or representative, could avail to defeat the ownership, even when the person who claims under a misappropriation had reason to believe that the person from whom he took the property had no right to it.” (Italics ours.)
When the fact is considered that the bills of lading in question, ■ were not negotiable in form, and the cotton was not deliverable to the order of Lallande, and that, therefore, the bills of lading were not transferable in market “when Lallande received them; and the *713 fact that even if they had been endorsed, they would have only pos-\ sessed 'a restricted negotiability, and, if lost or stolen, could have been recovered from a bona ft$e holder for value; when added to the fact that the bank acquired them from a merchant and factor, without question, and who was without authority to pledge them for his own debt, it seems clear that the owner of the property should recover.
Lallande, being a commission merchant and cotton factor, and well known to the bank as such for a series of years anterior to the time of these transactions, it is chargeable with notice of the relations existing between the parties, or it was reasonably put upon its guard against danger by the possession of such knowledge, and under the circumstances should have instituted proper inquiries of Lallande. Surely the bank can not plead ignorance of the law prohibiting a factor to pledge his customer’s property for his own debt, and at the same time protect itself by pleading its own supposition of Lallande’s ownership, from what appeared on the face of bills of lading which are non-negotiable in terms. By the course of its own dealing it assumed the risk of Lallande’s title and the validity of the pledge.
This case, in our opinion, occupies the precise attitude of Stern Bros. vs. Bank, 34 An. 1120. In that case it is stated'that the plain. tiffs owned the coupons; that Bader & Co. had no authority to pledge them to the bank; that they had so pledged them for their personal account after their maturity. The court held:
“The authorities are quite numerous, and entirely convincing, that, the purchaser or pledgee of negotiable instruments after maturity, whose rights are derived from one who is not the owner, and who is. not authorized to pledge, acquires no title or rights thereto or there-y upon as against the true owner.”
Bills and promissory notes overdue are still negotiable quite as much so as they were before they became due, but the effect of their transfer after maturity is different from the effect of such transfer before maturity. In the latter case the purchaser, or pledgee, in good faith acquires free of equities between the original parties;, but in the former case he does not. So it is in respect to the transfer of non-negotiable bills of lading; the transfer passes only such! title as the transferor had, subject to equities existing between ' him and the consignor and shipper.
*714 / This is nota case for the application of the equitable estoppel plead ?by the bank against the claims of the owner. As far as the record shows, the shipper had no agency whatever in the matter, and evidently accepted jnst such a bill as the carrier tendered him. As was very justly observed by the Supreme Court in the Liverpool Steam Co. vs. Phœnix Ins. Co., 129 U. S. 441: “ The carrier and his customers do not stand upon a footing of equality. The individual customer has no real freedom of choice. He can not afford to higgle or stand out and seek redress in the courts. He prefers rather to accept any bill of lading, or to sign any paper that the carrier presents; and in most cases he has no alternative but to do this or abandon his business.”
The plaintiff seemed to have had no choice or volition in the matter, and the doctrine of equitable estoppel does not apply to such a case.
Judgment affirmed.