### No. 12,665.

#### ESTATE OF MRS. E. A. LITTELL.

A physician, a relative of an aged and infirm lady, rendered her professional services extending through several years. He made no charge against her while living, but was told by her she would compensate him. Shortly before her death she gave into his hands five thousand dollars in cash. He says this was a donation to his wife; but it appears to have been received by him, and to have passed under his administration and control. Under the circumstances developed by the evidence, *Held:* This was the compensation she referred to and the remuneration he depended on, and he can not recover on a large claim for professional services presented or asserted for the first time after her death.

(On another matter in the same succession). While the fact of knowledge of an endorsee that a note he discounts is an accommodation note is no defence against it if taken for value, *bona fide*, before maturity, where such a note is given for a special object, which is abandoned, and afterward, in fraud of the maker, it is negotiated, and the endorsee knows or has reason to believe such fraud, his participation in its commission bars his recovery.

This applies with all the more force to instruments non-negotiable in character, for, not being negotiable, greater caution is required of the purchaser.

APPEAL from the Eleventh Judicial District Court for the Parish of St. Landry. *Dupré, J.*

---

*Thomas H. Lewis* for Succession, Appellant.

---

*Henry L. Garland, Jr.*, and *E. B. Dubuisson* for Executors, Appellants.

---

*Henry L. Garland, Jr.*, and *E. B. Dubuisson* for Dr. R. M. Littell, Opponent, Appellant.

*Kenneth Baillio* for Vincent Boagni, Opponent and Appellant.

---

*Kenneth Baillio* for Edward M. Boagni, Jos. E. Boagni, Mrs. Eleanor Comeau and Mrs. M. C. Moseley in the matter of the opposition of Robert M. Littell, Appellees.

---

*Henry L. Garland* and *E. D. Estillette* for Bessie Millard, and Nellie Haw, wife of Robert Smith, Legatees, Appellees.

---

Submitted on briefs December 14, 1897.
Opinion handed down January 24, 1898.
Rehearing refused March 7, 1898.

---

The opinion of the court was delivered by

BLANCHARD, J. Mrs. Eleanor A. Littell died in 1895, well advanced in years and leaving a considerable estate. There were no forced heirs. She left a last will and testament, olographic in form, which was duly admitted to probate. Dr. T. T. Tarlton and Dr. R. M. Littell were named as executors and qualified as such. Her property was bequeathed in the main to her nieces and their children. There were some other legacies.

The executors filed what was called a partial account and classification of debts and *projet* of distribution to legatees and heirs.

Oppositions were filed by various parties, and from judgments thereon this appeal is prosecuted.

### OPPOSITION OF DR. R. M. LITTELL.

This opposition is founded upon a claim for professional services rendered to the deceased during the last three years of her life. The amount of the claim is three thousand four hundred and eighty dollars.

For several years prior to her death the deceased was suffering from a chronic ailment. She needed the almost constant care of a physician. Near her lived Dr. T. T. Tarlton. Some twelve miles distant lived Dr. R. M. Littell, the opponent. Both were practising physicians and brothers-in-law. Each had married a niece of the deceased, and opponent was also a relative by blood. The families

of both were on terms of the closest intimacy with the deceased. Indeed, they were looked upon by her as members of her family, and they so regarded themselves. She named the two physicians as her joint execrtors, and the members of their families were the chief beneficiaries of her bounty.

During her long period of illness and suffering it was natural that she should rely upon these two physicians, her nephews by marriage and members of her family, for professional attention. Both attended her, rendering about the same degree of care and service. They came at her request—were sent for. Oftentimes they came without being set for. Their wives were there, too, as was to be expected, nursing and ministering to their old and infirm relative. Sometimes the families of one or the other of these physicians would remain for weeks at a times in the house of the deceased.

Neither of the physicians at any time during the lifetime of the deceased made any charge for professional services rendered her, though these services extended through the long period of three years.

It is shown the deceased was particular and exact in the matter of paying her debts, had abundant means to meet her obligations and did not want bills to remain outstanding against her.

After her death Dr. Littell came forward with the claim herein declared on. Dr. Tarlton makes no claim.

It is not disputed that Dr. Littell's services were valuable, his visits frequent and often protracted. He was not seldom called at night. Once he accompanied her to New Orleans to consult a physician there, and it is claimed that his general practice suffered in consequence of the time taken up by his attendance upon the deceased.

It is not pretended there was any agreement between the opponent and the deceased in reference to compensation to be paid him. The suit is upon a *quantum meruit*. He charges for eighty-seven days' attendance at forty dollars per day, including mileage.

The claim is resisted on the ground that its presentation against the succession is an afterthought; that it was not considered by opponent a debt due him prior to the death of Mrs. Millard; that he never intended to make a specific charge against her; that she never understood he would do so; that the service was rendered as one of her family; that he and his family were beneficiaries of her bounty,

and that he had relied upon her generosity for recompense and had been fully recompensed.

The testimony establishes to our satisfaction this contention of the defence.

We are convinced that the opponent did not render his professional services under contract, either express or implied, and depended entirely on the beneficence of his patient and relative for remuneration. Asked on cross-examination whether or not he had ever notified the deceased or intimated to her that he intended to charge for his services, he replied "no," and added that she had told him she would compensate him for what he would do for her. She did not state in what manner she proposed to compensate him, whether in her will or otherwise, whether to him directly or to members of his family, and he seems to have been perfectly satisfied to leave the compensation, and the manner of it, he was to receive to her.

That she did compensate him is shown by the evidence. Shortly before her death she made a donation of five thousand dollars in money to him or to his wife. The amount was either handed directly to opponent himself, or collected by him. He says this was a donation to his wife. Whether to him or her, it was a manual gift delivered into his hands and a remunerative donation. C. C. 1523, 1525, 1539.

He and his family received other benefactions from her. She paid part of the tuition of his children; his family lived for a while at her house, she became security for a large sum for him, signing the notes with him; and she had previously given to his wife two thousand dollars with which to buy a house and lot.

The donations to opponent's wife, became, under our law, paraphernal in character, it is true, but the husband in this case has the administration and benefit of the same, and, besides, we are satisfied that the five thousand dollars given twenty days before Mrs. Millard's death was the kind of compensation she had reference to when she told him she would compensate him, and that he at that time expected.

Under the circumstances developed by the evidence in this case, unlike those of Danenhauer vs. Succession of Brown, 48 An. 341, the Succession of McNamara, 48 An. 46, and other cases cited in behalf of opponent, we do not think he is entitled to recover.

The case is controlled by the principle announced in Jacob vs. Ursuline Nuns, 2 M. 269, and Tilghman vs. Lewis, 8 La. 108. See also Keever on *Quasi* Contracts, p. 315 *et seq.*

## OPPOSITION OF DR. VINCENT BOAGNI.

This opponent claims to be a creditor in the sum of two thousand dollars and interest, as the holder of two notes executed *in solido* by R. M. Littell and the deceased, which he alleges he acquired in good faith before maturity for a valuable consideration.

The executors declined to recognize the claim for the reason that so far as the deceased was concerned she had signed the notes merely as security for Dr. Littell; that opponent was well aware of this when he accepted it; that at the time he acquired the notes he had received along with them as collateral security certain assignments and transfers of the salary to become due to Dr. Littell as coroner and parish physician of the parish of St. Landry for the years 1894 and 1895; that he knew Dr. Littell had executed these assignments of his salary for the purpose of securing payment of the notes; that opponent collected the salary transfers in full, amounting to two thousand one hundred dollars, and instead of applying the proceeds to the extinguishment of the notes, he had diverted the same by and through the connivance of Jos. Bloch, who was the party through whom the negotiation was made, to the satisfaction of a debt due him by Bloch.

The trial judge believed the evidence established this defence and rejected the claim. He did not err.

There is a direct conflict between the testimony of Bloch and that of opponent. Bloch, while candidly admitting his fault and giving as a reason for his subsequent consent to opponent's proposition to divert the proceeds of the salary transfers to claims held by opponent against him that he was hard pressed financially, narrates the facts and circumstances under which he negotiated the two notes to opponent for Littell, and states that he transferred the salary assignments as collateral security, attaching the same to the notes. He testifies he informed opponent that Dr. Littell had executed the assignments for that purpose, though they had been made payable to Jos. Bloch or bearer; that the notes and the salary assignments bore the same date, and were received by him from Littell at the same time; and that he affected the negotiation with opponent as one trans-

action, placing the notes and salary transfers in his hands contemporaneously, and taking opponent's receipt for the salary transfers, which recited that he held the same as collateral for the notes. He further testifies that long subsequently, at opponent's suggestion, he consented to the diversion of the salary assignments, as above set forth, and surrendered to opponent the receipts he had previously given for the same; that before he did this he endeavored by direction of opponent to secure the consent of Dr. Littell and Mrs. Millard to the diversion; and that failing in this, he and opponent agreed on and affected the diversion notwithstanding. It is shown that the deceased, whose estate is sought to be made liable, knew nothing whatever of of these transactions beyond the signing of the notes at Dr. Littell's request. She was never asked to consent to the diversion, though Littell was, and declined. Littell owed Bloch a sum of money, and being pressed by the latter for it, executed the two notes, procured the signature of his relative, Mrs. Millard, (formerly Mrs. Littell) thereto, wrote out the salary assignments, handed the notes and assignments to Bloch, told him to negotiate the notes, with the salary transfers as collateral, pay himself what he (Littell) owed him, and apply the remainder to the taking up of a debt Littell owed the bank.

This is the way Bloch happened to be in possession of the notes and collaterals, and accounts for the interest he had in effecting the negotiation with opponent.

It is shown, besides, that Bloch owed opponent at the time, and that he left in his hands, out of the proceeds of the negotiation, a sum equal to the amount due him (Bloch) by Littell.

Opponent's version is that Bloch brought the notes to him to negotiate; that to fortify them he offered the Littell transfers of salary; that he took the notes and transfers and gave his receipt for the latter; that he bought the two notes outright and has kept them since as his property; and that he considered the salary transfers as collateral to secure the notes. Later on, he says, Bloch came to him and with the view of protecting some friends in New Orleans offered to return opponent the receipts the latter had given for the collaterals, stating that upon the giving up of the receipts there would be " no evidence that this paper (meaning the salary transfers) does not belong to you outright," that " then you will be the owner of the Littell notes and the owner of the collaterals."

Estate of Littell.

The " friends in New Orleans " Bloch desired to protect were the Schwartz Machinery Supply Company. This concern had, it seems, accepted a draft for him which had gone to protest and passed into the hands of opponent, who had directed his attorneys in New Orleans to institute suit on the same. The Supply Company appealed to Bloch to protect them by preventing suit. Hence, his second visit to opponent.

The latter states that Bloch's proposition "suited him very well " and he accepted it.

In other words, he and Bloch detached the salary transfers from their destination and designation as collaterals to the Littell notes and made them over to opponent in payment by novation of another debt due him by the Supply Company and Bloch.

Opponent states further 'that Bloch was apparently and to his knowledge " the absolute owner of the notes and transfers."

How he knew him to be "the absolute owner " beyond the presumption which sprang from his possession of the notes and the transfers (the latter being made payable to Bloch or bearer), he does not explain.

He insists he had at that time no knowledge that Bloch was not the owner, that he had acquired all the paper in good faith, that he was not aware the salary transfers were intended solely to secure payment of the notes, or that the notes were, as to Mrs. Mallard, mere accommodation paper.

Opponent is an interested witness testifying in his own behalf. Bloch is without interest in the suit, and while he appears in a bad light with regard to his participation in the scheme to divert the collaterals, equally so does the opponent. But if we should give to the testimony of the one as much credence as to that of the other, there are facts and circumstances appearing which turn strongly the preponderance of evidence in favor of that view of the case which frees the estate from liability.

If opponent did not know or have reason to believe Bloch was negotiating the notes for Littell and was not the owner of them, and the salary transfers himself, why was it he did not retain a larger part or even all of the proceeds in payment of what Bloch owed him? The latter was then largely indebted to him. Yet he retained only eight hundred dollars of the proceeds of the negotia-

tion on the debt, handing Bloch the remainder, one thousand dollars. No explanation of this was attempted.

The opponent, who was the brother-in-law of the deceased, wel[1] knew she was possessed of large means, and hence, no collaterals were necessary to secure her notes. But with Dr. Littell, whose circumstances were not so good, it was different. The notes being signed first by him and then by the deceased, and being dated the same day as were Littell's transfers of salary, and the whole turned over to opponent at one and the same time, must be held as conveying notice to opponent, or at least putting him on his inquiry, that the loan was for Littell's account, and his transfers of salary intended to protect them and relieve his relative who had become his security. A significant admission, bearing on this, was made by opponent. Having declared he considered Mrs. Millard's notes good paper, he said: "Yet I thought that as they came due Dr. Littell could not pay them, and therefore I would have to ask Mrs. Millard, and my relations with her were such, and on account of her health, I did not wish to have to make a demand upon her." We agree with the trial judge that this conveys the idea that opponent believed Dr. Littell would not be able to pay *his* notes when they matured, and he wanted and took the salary transfer from Littell to avoid demanding payment of his debt from his surety, Mrs. Millard.

Again, opponent gives his case away when he testifies that Bloch told him at the time the agreement was made to take the collaterals in satisfaction of the Supply Company's acceptance of Bloch's draft and surrendered the receipts for the collaterals, "there is no evidence that this paper does not belong to you outright." This declaration was sufficient to put any reasonable man on his guard, or, at least, raise a strong suspicion in his mind that Bloch was without right to so divert the collaterals.

Other circumstances might be mentioned, but these suffice.

Dr. Boagni must be held as having had, at the least, reason to believe Bloch was not the owner of the salary assignments, and that he held the same only to secure the notes of Dr. Littell and Mrs. Millard. He can not, therefore, be considered a *bone fide* purchaser. Shaw vs. R. R. Co., 101 U. S. 557.

There was more than a mere negligence on his part in not making inquiry as to the nature of Bloch's tenure of the transfers; there is more than a mere reason for suspicion that he knew such inquiry

would develop facts it did not suit him to have developed.   There is reason to believe he knew Bloch had no right to make over to him the ownership of the transfers.  If the circumstances were sufficient to raise a reasonable *belief* even, on his part, of this, it falls very little, if any, short of knowledge and equally puts a party on his guard. 101 U. S. 566.

He preferred to make no further inquiry and simply took his chances.

It is no defence against a note that it was known by the endorsee or transferee to be an accommodation note, if he takes it for value, *bona fide*, before maturity.  But when such a note is given for a special object which is abandoned and afterward, in fraud of the maker, it is negotiated and the endorsee knows, *or has reason to believe*, such fraud, his participation in its commission bars his recovery.   Smith vs. Van Loan, 16 Wend. 662; 7 An. 227.

This applies with all the more force to the transfers of salary made by Dr. Littell, which can not be viewed as negotiable instruments.   Not being such, greater caution was required of the purchaser.  In this regard the case comes within the principles laid down by Norton on Bills and Notes, pp. 301 and 302.

As to Legacies of Bessie Millard, Mary E. Boagni, Nellie Haw, S. V. Dooley, John B. Barber and Rosa Blackstone.

The four first mentioned were named in the will as legatees to receive five thousand dollars each, and the two last mentioned as legatees to receive five hundred dollars each.  It was directed in the will that all of these legacies be paid out of a certain fund loaned on interest for the deceased by S. V. Dooley, subject to collection by him.

The evidence discloses that at the death of the testatrix there was of the particular fund bequeathed to the legatees mentioned in the hands of Dooley the sum of seven thousand four hundred and forty-eight dollars and eighty-five cents, and that of this amount the executors had collected five thousand eight hundred and forty-nine dollars and twenty cents, which was in bank to their credit.

Claiming that the amounts bequeathed to them are legacies under a particular title, the persons named, or certain of them, demand

the immediate delivery of the sums given them out of the funds that were in Dooley's hands, or their proportionate share of the same.

The executors do not deny that the parties named are legatees under a particular title, and they interposed no objection to a judgment ordering their payment, but contended it should be an order to pay *in due course of administration* and not an order to pay *at once.*

They appeal from a judgment decreeing immediate payment.

From the brief filed on their behalf we make the following excerpt: "If this court should affirm the judgment of the lower court, rejecting the claim of Vincent Boagni and R. M. Littell, then there will be funds sufficient in the hands of the executors to pay the amounts allowed to complaining legatees, but the executors should not take upon themselves the risk which they should incur by a reversal on appeal of that judgment."

From this it appears that the executors have no reason to oppose the order for immediate payment of the legacies under consideration, at least as far as the particular fund in their hands will go, if, by the judgment of this court affirming that of the court below, the large claims of R. M. Littell and Vincent Boagni are not sustained as debts due by the succession.

The judgment of this court on the oppositions of Littell and Boagni removes the apprehensions of the executors and those claims are not recognized as debts against the estate.

We find no error in the judgment of the lower court as far as appealed from, and the same is affirmed.

MR. JUSTICE MILLER—I concur in the decree.