CHARLES H. COX *vs.* CENTRAL VERMONT RAILROAD.

FRANCIS A. AMBLER *vs.* SAME.

W. F. BURDITT & another *vs.* SAME.

E. C. DENNIS *vs.* SAME.

ROBERT T. PRENTISS *vs.* SAME.

DAVID WHITING & others *vs.* SAME.

C. B. EDGERLEY *vs.* SAME.

E. C. CROSBY & another *vs.* SAME.

HOWARD B. CHASE *vs.* SAME.

W. B. JOHNSON *vs.* SAME.

SAMUEL P. TRAIN *vs.* SAME.

ORRIN B. LANDON *vs.* SAME.

Suffolk.    November 10, 11, 1896. — January 8, 1898.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Warehouseman — Negligence — Instructions — Law and Fact — Bill of Lading — Carrier — Assent to Contract — Limitation of Liability — Validity of Stipulations — Burden of Proof — Evidence.*

The care required of a warehouseman over property in his custody is ordinary care.

Upon the facts in this case, which was an action for the loss of property by fire while in the defendant's elevator, the jury were justified in finding that the fire

started at the foot of the lofting leg of the elevator and was due to the defendant's negligence.

At the trial of an action for the loss of property by fire while in the defendant's elevator, the plaintiff contended, and there was circumstantial evidence tending to show, that the fire started at the foot of the lofting leg, but there was no direct evidence of the place or manner of its origin. The defendant requested the judge to instruct the jury to return a verdict for the defendant, if they did not find that the fire originated at the foot of the lofting leg, on the ground that whether the fire originated anywhere else was pure speculation. The judge instructed the jury that the burden was on the plaintiff to satisfy them that the fire was due to the defendant's negligence ; that, in order to find this, they must be satisfied where and how it originated ; and that, unless they were so satisfied, they should return a verdict for the defendant. *Held*, that the defendant had no ground of exception.

A bill of lading is not a negotiable instrument in the ordinary sense of those words ; and an indorsement and delivery of it for value operate to transfer the title to the goods described in it, but not as an assignment of the contract, except by force of some statute.

*It seems*, that the receipt by an assignee of a bill of lading without objection to its terms, and the subsequently demanding of the carrier the goods described in it, and, upon the refusal or neglect of the latter to deliver the same, the bringing suit to recover damages therefor, should be regarded as evidence of assent on the part of the assignee to the stipulations contained in the bill of lading.

Stipulations in a bill of lading, that "no carrier, or the property of any, shall be liable for . . . any loss or damage arising from any of the following causes, viz. fire from any cause, on land or water," and that the carrier shall not be liable for any loss or damage by fire "unless the same shall affirmatively, and without presumption, be proven to have been caused by the negligence of the person or party sought to be made liable," are invalid.

One who receives from a common carrier a bill of lading which purports on its face to set forth the terms of carriage, and accepts and acts upon it without objection, ordinarily will be presumed, as in other cases of contract, in the absence of fraud or other sufficient excuse, to have assented to its terms, so far as the provisions therein contained are lawful and not opposed to public policy.

In an action against a warehouseman for loss of goods, if the defendant relies on the failure of the plaintiff to comply with a stipulation in the bill of lading under which the goods were transported, the burden of proof is on the defendant to show that the stipulation was a just and reasonable one.

A stipulation in a bill of lading, — under which grain is transported by water from Chicago to Ogdensburg and there unloaded into an elevator and held subject to order for shipment by rail to various parts of New England, — that the carrier shall not "be liable in any case or event, unless written claim for the loss or damage shall be made to the person or party sought to be made liable, within thirty days," is invalid ; but a stipulation that "the action in which said claim shall be sought to be enforced shall be brought within three months after the said loss or damage occurs," is just and reasonable, and operates as a bar to an action brought after the expiration of three months from the happening of the loss.

A bill of exceptions alleged at the trial of an action against a railroad corporation for loss of property by fire while in the defendant's grain elevator, stated that "it was agreed between the parties that under the bills of lading, and in view of the situation of the property at the time of the loss, the liability of the defend-

ant to the plaintiff was that of a warehouseman simply "; and the agreements and stipulations contained in the bills of lading were treated as applying to the defendant as a warehouseman. *Held,* that the defendant had no ground of objection to an instruction to the jury that its liability was that of a warehouseman.

In an action against a warehouseman for loss of property by fire while in the defendant's elevator, testimony of a former foreman of the defendant, who had not been in its employ for several years before the fire, as to habits of intoxication of the defendant's watchman while the witness was foreman, if supplemented by evidence that such habits continued to the time of the fire, is competent to show that he was not a suitable person to be employed as watchman, and that the defendant, by reasonable diligence, might have discovered what his habits were.

At the trial of an action for loss of property by fire while in the defendant's grain elevator, there was evidence tending to show that, about two hours before the fire broke out, the watchman, who was shown to have had previous habits of intoxication, was seen in the office with his hat and shoes and coat off, and the coat with a cushion was on the floor where apparently he had been lying down; that a person who went to the door of the office at the time had some difficulty in rousing him; and that the fire was discovered by others before he saw it. *Held,* that it could not be said that there was no evidence from which it fairly could be inferred that he was intoxicated on the night of the fire.

TWELVE ACTIONS, the declaration in each of which contained four counts, two in contract and two in tort, the first three being against the defendant as a common carrier, and the fourth, upon which the cases were tried, being against the defendant as a warehouseman for the loss by fire of a quantity of grain while in the defendant's elevator at Ogdensburg, New York. At the trial of the cases together in the Superior Court, before *Hopkins,* J., the jury returned verdicts for the plaintiffs in the first eleven cases; and the defendant alleged exceptions. In the twelfth case, the judge directed the jury to return a verdict for the defendant; and the plaintiff alleged exceptions. The facts appear in the opinion.

*C. A. Prouty* (of Vermont), for the defendant.

*R. M. Morse & W. M. Richardson,* for the plaintiffs.

MORTON, J. These twelve actions were all tried together, and all relate to certain grain which was being transported from Chicago to various points in New England, and which was destroyed by fire while in the defendant's elevator at Ogdensburg, on September 9, 1890. The declarations are the same in all of the cases. Counts in contract were joined with counts in tort, the last count, which was the one relied on, being in tort, and charging the defendant with negligence as a warehouseman.

In all of the cases except the last, verdicts were rendered for the plaintiffs. In the last, a verdict was ordered by the court for the defendant, on the ground that the action, was not brought within three months after the loss occurred, as provided in the bill of lading, or from the time when by due diligence the plaintiff might have discovered that fact.

In nine of the cases, namely, those of Cox, Ambler, Burditt, Dennis, Prentiss, Crosby, Johnson, Train, and Landon, the grain was being transported under what were termed yellow bills of lading, which provided, amongst other things, that "the said company shall not, nor shall any carrier, person, or party aforesaid be liable in any case or event, unless written claim for the loss or damage shall be made to the person or party sought to be made liable, within thirty days, and the action in which said claim shall be sought to be enforced shall be brought within three months after the said loss or damage occurs." They also provided that neither the company nor any carrier, person, or party in possession of said grain " shall . . . be liable for any loss or damage from : . . fire while . . . in store at any place of shipment or transshipment, . . . nor shall there be any liability . . . for any loss or damage . . . unless the same shall affirmatively and without presumption be proven to have been caused by the negligence of the person or party sought to be made liable." In the cases of Whiting, Edgerley, and Chase, the grain was being transported under what were termed white bills of lading, which contained no limitations as to the time within which notice of the loss should be given, or the action should be brought, but which provided that "no carrier or the property of any shall be liable for . . . any loss or damage arising from any of the following causes, viz. fire from any cause, on land or water," etc. In only two of the cases, namely, those of Dennis and Prentiss, was there any evidence tending to show that written notice of loss was given.

The exceptions state: " It was further agreed between the parties that under the bills of lading, and in view of the situation of the property at the time of the loss, the liability of the defendant to the plaintiffs was that of warehouseman simply." It is well settled that in such a case the care required is ordinary care, (*Thomas* v. *Boston & Providence Railroad*, 10 Met. 472,) and the jury were so instructed.

The plaintiffs contended, in substance, that the fire started at the foot of the lofting leg in consequence of the heating of the bearings and the accumulation of dust and chaff, that the watchman was incompetent and a proper watch was not kept, and that suitable appliances for extinguishing fire were not furnished. The defendant contended that there was no evidence that the fire was due to negligence on its part, and this is the first question presented for consideration.

It is said in the exceptions, that there was no direct evidence that the fire started at the foot of the lofting leg, nor of the place or manner of its origin, but we think that there was circumstantial evidence which justified the jury in finding, if they did so find, that the fire started at the foot of the lofting leg and was due to negligence on the part of the defendant.

The lofting leg was on the west side of the elevator, and ran from the first floor to the cupola on the outside of the main wall of the elevator, and about in the centre was a projection, which began a short distance above the wharf and extended above the main roof, and which was used for stairways and for a part of the elevating machinery called the marine leg. Beneath this was an opening in the main wall through which ran ropes that operated a steam shovel used in connection with the work of elevating the grain. The foot of the lofting leg was inside the elevator about opposite this projection and opening, and a short distance from it. There were on the east side a similar projection and lofting leg, and in about the same relative positions to each other and to the main wall of the elevator. On the day previous to the fire the machinery on the west side had been in operation from seven o'clock in the morning till between eight and nine o'clock in the evening, with an hour's intermission for dinner and another hour for supper. It appeared that in operating an elevator dust and chaff of a very inflammable nature are caused. There was testimony tending to show that it was usual to sweep out the elevator while grain was being elevated, or after the work was finished, but that on the night of the fire this was not done; that the bearings at the foot of the lofting leg on the west side were liable to become heated from the operation of the machinery, and that dust and chaff were liable to accumulate about them, and that this was known to the fore-

man; that about four weeks before the fire in question, fire had been discovered in the dust and chaff about one of the bearings at the foot of the lofting leg on the west side; that on the night of the fire the bearings were warm, and there was a smell of heated oil from them or from bearings near by, the testimony leaving it somewhat uncertain which was meant by the witness; that the pipes through which the bearings were oiled were liable to become choked up with dust and chaff, thereby increasing the tendency of the bearings to heat; and that the fire when first discovered appeared to be in the projection on the west side just above the lower end of it. One witness, who went into the elevator a short time after the alarm had been given, testified that he saw fire on the west side " thirty to thirty-five feet from the projection, and quite a ways from the lofting leg." The testimony also tended to show that after the fire the lofting leg on the east side was standing, or a part of it, but that the lofting leg on the west side was burnt up, and the timber and flooring around the foot of it were, as one witness said, "all burnt up," or, as another witness said, " burned . . . more . . . than any other part of the foundations." There was contradictory evidence in relation to some of these matters, and evidence tending to show that the fire could not have originated at the foot of the lofting leg. But the question before us is not as to the weight of the evidence, but whether there was any evidence which fairly justified the verdicts that were rendered for the plaintiffs. *Forsyth* v. *Hooper*, 11 Allen, 419. We think that the facts to which we have referred, if believed, and especially if taken in connection with the further fact that no other satisfactory explanation of the origin of the fire seems to have been offered, would have justified the jury in finding that it started at the foot of the lofting leg and was due to the defendant's negligence.

We cannot say that the jury were not justified in finding, if they did so find, that the watchman was incompetent, or that sufficient care was not exercised in watching, and that if the watchman had been competent, or more care had been taken in watching, the fire might have been discovered and prevented. Neither can we say, as matter of law, that the jury was not justified in finding, if they did so find, that the absence of automatic sprinklers in a building in which so much inflammable matter

was present, was not, considering the extent to which they had been introduced, negligence on the part of the defendant, or that if the building had been equipped with them they might not have checked the fire, and ultimately have been serviceable in extinguishing it.

The defendant objects that the jury should have been instructed, as requested, to return verdicts for the defendant, if they did not find that the fire originated at the foot of the lofting leg, on the ground that whether the fire originated anywhere else was pure speculation. But there was testimony from one witness tending to show that on the night of the fire he noticed a smell of hot oil which came from the bearings of the steam shovels which were near the lofting leg, and the fire might have originated there. It would not have been true, therefore, to say that whether the fire originated anywhere else was pure speculation. Moreover, the judge instructed the jury that the burden was on the plaintiffs to satisfy them that the fire was due to the defendant's negligence, that in order to find this they must be satisfied where and how it originated, and unless they were, they should return a verdict for the defendant. These instructions excluded speculative possibilities, and required the jury, in order to render verdicts against the defendant, to determine the place where and the manner in which the fire originated, and it is to be presumed that the jury followed the instructions thus given. Certainly there is nothing which tends to show that they did not, or that they did not find that the fire started at the foot of the lofting leg.

The defendant further contends that the rights and liabilities of the parties are to be determined according to the agreements and stipulations contained in the bills of lading, and that under these it is not liable in the cases coming under the white bills of lading for loss or damage arising from fire, and in those coming under the yellow bills of lading for loss by fire " unless the same shall affirmatively, and without presumption, be proven to have been caused " by its negligence, nor whatever the cause unless written claim for the loss or damage was made within thirty days after it happened, or the action was brought within three months thereafter.

The circumstances under which the bills of lading were issued

are not fully disclosed. It does not appear whether the shippers acted as the agents of the plaintiffs in purchasing and shipping the grain, or whether the relation between them was that of buyer and seller. A bill of lading is not a negotiable instrument in the ordinary sense of those words. *Stollenwerck* v. *Thacher*, 115 Mass. 224. An indorsement and delivery of it for value operates to transfer the title to the goods described in it, but not as an assignment of the contract except by force of some statute, as is now the case in England and some of the States here. *Blanchard* v. *Page*, 8 Gray, 281. *Finn* v. *Western Railroad*, 112 Mass. 524. Abbott, Merchant Shipping, (13th ed.) 1052. 4 Am. & Eng. Encyc. of Law, 554.

Accordingly it has been held that the liability of a consignee for freight arises, not from the bill of lading, but from a new promise on the part of the consignee, of which a demand for and receipt of the goods by him under and by virtue of the bill of lading are evidence. *Blanchard* v. *Page, ubi supra.* Abbott, Merchant Shipping, (13th ed.) 566. Similarly, it perhaps should be held that the receipt by an assignee of a bill of lading without objection to its terms, and subsequently demanding of the carrier the goods described in it, and, upon its refusal or neglect to deliver the same, bringing suit to recover damages therefor, should be regarded as evidence of assent on the part of the assignee to the stipulations contained in the bill of lading.

But it is not necessary to consider that question now. The trial proceeded, without objection, on the assumption that the rights and liabilities of the plaintiffs and defendant were the same as if the bills of lading had issued directly from the defendant to the plaintiffs, and the agreements and stipulations contained in them had been entered into in the first instance between the plaintiffs and the defendant.

It is well settled that common carriers may enter into contracts limiting their responsibility, if the effect is not to relieve them from the consequences of their own negligence, or that of their servants, and the contracts are in themselves just and reasonable. *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.* 129 U. S. 397. *Bank of Kentucky* v. *Adams Express Co.* 93 U. S. 174. *Southern Express Co.* v. *Caldwell*, 21 Wall. 264. *New York Central Railroad* v. *Lockwood*, 17 Wall. 357. *Hoadley*

v. *Northern Transportation Co.* 115 Mass. 304. *Pemberton Co.*
v. *New York Central Railroad,* 104 Mass. 144. *Grace* v. *Adams,*
100 Mass. 505. *Squire* v. *New York Central Railroad,* 98 Mass.
239. *Judson* v. *Western Railroad,* 6 Allen, 486.

Whether the contracts are just and reasonable has been
treated as a question for the court, where the facts are not in
dispute. *Hart* v. *Pennsylvania Railroad,* 112 U. S. 331, 342.

The effect of the stipulation in the white bills of lading in
regard to exemption from liability for loss by fire would be to
relieve the carrier absolutely from liability for loss caused by fire,
though resulting from its own negligence or that of its servants
or agents. This it cannot do. That also would be the effect of
the provision in regard to the amount of proof, unless the proof
came up to the height required. We think that the defendant
cannot evade in this manner the liability imposed on it by law
for the consequences of its negligence and that of its servants or
agents, and that this provision is therefore invalid.

In regard to the provision in the yellow bills of lading requir-
ing notice of any loss or damage to be given to the defendant
within thirty days after the same accrued, the court instructed
the jury that it was just and reasonable, and that it was binding
on the plaintiffs, provided that the defendant proved that they
clearly and unequivocally assented to it. There are no doubt
in some of the earlier cases in this State expressions which would
seem to justify the language of the charge. *Judson* v. *Western
Railroad,* 6 Allen, 486. *Buckland* v. *Adams Express Co.* 97
Mass. 124, 135. *Perry* v. *Thompson,* 98 Mass. 249. But we
think that the law must now be regarded as settled in this
Commonwealth in conformity with the weight of authority else-
where, that one who receives from a common carrier a bill of
lading which purports on its face to set forth the terms of car-
riage, and accepts and acts upon it, without objection, will be
ordinarily presumed as in other cases of contract, in the absence
of fraud or other sufficient excuse, to have assented to its terms,
so far as the provisions therein contained are lawful and not op-
posed to public policy. *Fonseca* v. *Cunard Steamship Co.* 153
Mass. 553. *Hoadley* v. *Northern Transportation Co.* 115 Mass.
304. *Gott* v. *Dinsmore,* 111 Mass. 45. *Parker* v. *Southeastern
Railway,* 1 C. P. D. 618. *Grace* v. *Adams,* 100 Mass. 505.

Porter, Bills of Lading, §§ 150 *et seq.* Hutchinson, Carriers, §§ 240 *et seq.* 4 Am. & Eng. Encyc. of Law, 516. 2 Am. & Eng. Encyc. of Law, 292–294.

In this view of the law the instruction was erroneous, and there must be a new trial if the stipulation was a just and reasonable one. If it was not, then the instruction was too favorable to the defendant, and it has no just cause for complaint.

The defendant relies on the failure of the plaintiffs to comply with the stipulation. The burden is on it, therefore, to show that the stipulation was a just and reasonable one. *Lewis* v. *Smith,* 107 Mass. 334. *Keene* v. *New England Accident Association,* 161 Mass. 149. *Lewis* v. *Great Western Railway,* 3 Q. B. D. 195. 5 Am. & Eng. Encyc. of Law, 326.

It is to be observed that the thirty days were to begin, not from the time when the shipper or consignee received notice of the loss or damage, but from the time when it occurred. There was evidence that the grain was being transported by what is known as a lake and rail route; that is, it was brought by water from Chicago to Ogdensburg, and there unloaded into the defendant's elevator and held subject to order for shipment by rail to various parts of New England. It did not clearly appear what was the length of time usually required from Chicago to Ogdensburg; one witness testifying that it took from seven to ten weeks and another from five to seven days. But after the grain reached Ogdensburg some time naturally would elapse before it reached its final destination, and, in ordinary course, the shipper or consignee would not probably learn of the loss or damage till then. Further time naturally would be required in the usual course of business to ascertain the facts respecting the loss before making a demand on the carrier. It may be easily conceived, therefore, that the whole thirty days might expire without fault on the part of the consignee or shipper before he would be in a position to assert a claim against the carrier. Taking the nature of the defendant's business into account, it was reasonable that there should be some time fixed within which notice of claims against it for loss or damage occurring in the course of transportation should be presented. But, for the reasons given, we are not satisfied that the time fixed in the present cases was just and reasonable, and we think therefore that the stipulation must be regarded as invalid. *Central Vermont Railroad* v. *Soper,* 59 Fed. Rep. 879.

It is possible that notice might be given within thirty days, as was done in the cases of Prentiss and Dennis, but the question of reasonableness or unreasonableness does not depend on the possibility of giving the notice in a particular case within the time limited, but on the course and nature of the business, and on the time which ordinarily might be expected to elapse in the usual course of business before the shipper or the consignee with ordinary diligence would be in a position to make demand on the defendant. If, applying these considerations, the time within which the notice was to be given was reasonable, it would furnish no excuse that in a particular instance it proved insufficient. Parties failing to comply with the requirement would do so at their peril.

Landon's case stands differently from any other. It is the only one in which suit was not brought within three months after the loss occurred. This provision is separable from that requiring thirty days' notice, and is, we think, just and reasonable. He has suffered the time to elapse without bringing suit, and we think that the provision operates as a bar to the maintenance of this action.

The defendant objects to the instruction that the defendant's liability was that of a warehouseman. But it was agreed, as previously stated, that that was the nature of its liability and the agreements and stipulations contained in the bills of lading were treated as applying to it as a warehouseman. So that whether regarded as carrier or warehouseman the defendant gets the full benefit of the provisions contained in the bills of lading, which was all that it contended for.

The only remaining exception which the defendant has argued relates to the admission of certain evidence concerning the habits of intoxication of Kelly, the watchman. The plaintiffs proposed to ask a witness who had formerly been a foreman for the defendant, but had not been in its employ for several years before the fire, what Kelly's habits were in that respect while he was foreman. The defendant objected. Thereupon, on the statement of counsel for the plaintiffs that they proposed to show that the habits continued down to the time of the fire, they were allowed to put the testimony in, the court saying, in effect, that it would go for nothing unless supplemented by evidence that the

habits continued to that time. Afterwards the plaintiffs put in such evidence. The precise scope of the objection did not appear. But we think that the testimony was competent, in connection with that which was subsequently introduced, to show that Kelly was not a suitable person to be employed as watchman, and that the defendant by reasonable diligence might have discovered what his habits were. *Gilman* v. *Eastern Railroad*, 13 Allen, 433. *Gahagan* v. *Boston & Lowell Railroad*, 1 Allen, 187.

We cannot say that there was no testimony from which it fairly could be inferred that he was intoxicated on tne night of the fire. There was testimony tending to show that two hours or thereabouts before the fire broke out, he was seen in the office with his hat and shoes and coat off, and the coat with a cushion was on the floor where he apparently had been lying down. There was also testimony tending to show that a person who went to the door of the office at this time had some difficulty in rousing him, and that the fire was discovered by others before he saw it. We think that evidence of his previous habits, which the defendant in the exercise of reasonable care ought to have known, in connection with evidence of his condition at the time of the fire, was competent.          *Exceptions overruled.*