NEW YORK CENT. & H. R. R. CO. v. BANK OF HOLLY SPRINGS.

(Circuit Court, N. D. Mississippi, W. D.   August 28, 1911.)

No. 457.

1. CARRIERS ⬥⟞56—CARRIAGE OF GOODS—BILL OF LADING—TRANSFERS.
      Where bills of lading to shipper's order for cotton were transferred to a bank, which had a lien on the cotton, the transfer, though the bills of lading were unindorsed, was a legal transfer of the cotton; that being the intention of the parties.
      [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 168; Dec. Dig. ⬥⟞56.]

2. CARRIERS ⬥⟞57—BILLS OF LADING—RIGHTS ACQUIRED—CLEARANCE.
      A firm engaged in buying and shipping cotton delivered cotton to a compress company, which issued receipts to the sellers. The receipts were attached to checks on a bank payable to the sellers, and the bank paid the checks and received the receipts as security. The bank surrendered receipts for cotton which the firm shipped, and received bills of lading to which drafts drawn on the firm were attached, and the bank gave the firm credit therefor. The firm forged bills of lading, and on faith of their validity a third person honored drafts drawn on him by the firm. The compress company operated on the block system, so that it was impossible to identify the cotton shipped as the exact bales for which receipts had been issued. *Held* that, as the bank was always careful to retain sufficient receipts to cover its claims, though allowing the firm's agent to take the receipts to the compress company and obtain a clearance, or notice to the carrier that a given number of bales were ready for shipment, the bank had as against the carrier the superior right to the cotton, which cannot be defeated because the carrier delivered it to the third person pursuant to the forged bills of lading, for a bank receiving genuine bills of lading is not responsible for the frauds of shippers.
      [Ed. Note.—For other cases, see Carriers, Cent. Dig. § 307; Dec. Dig. ⬥⟞57.]

⬥⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. CARRIERS ⬦⇒59—BILLS OF LADING—NEGOTIABILITY.

While the holder of a negotiable instrument circulating as money need not look beyond the instrument, and his right to enforce it will not be defeated by anything short of bad faith, a bill of lading, which is regarded as representing articles of merchandise in the possession of the carrier, stands on a different basis, though by transfer of the bill of lading there is a symbolic transfer of the property in the possession of the carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 170–190; Dec. Dig. ⬦⇒59.]

4. CARRIERS ⬦⇒59—BILLS OF LADING—EFFECT OF SALE—FORGED BILL OF LADING.

Where a shipper, who delivered to a bank a genuine bill of lading with the draft attached, receiving credit therefor, uttered a forged bill of lading, which he transferred to a third person, the fact that the forged bill of lading with draft attached evidenced a sale, and as between the shipper and a third person might operate to pass title, will not defeat the bank's paramount title.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 170–190; Dec. Dig. ⬦⇒59.]

5. CARRIERS ⬦⇒57—BILLS OF LADING—CONVERSION—WHAT CONSTITUTES.

Where a railroad company delivered cotton to a holder of a forged bill of lading, refusing to make delivery to a bank, the holder of the genuine bill of lading with drafts annexed, the company was guilty of conversion, rendering it liable to the bank for the value of the cotton.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 307; Dec. Dig. ⬦⇒57.]

In Equity. Suit by the New York Central & Hudson River Railroad Company against the Bank of Holly Springs, in which defendant filed a cross-bill. Decree for defendant.

On complainant's appeal, the decree was modified and affirmed. See 195 Fed. 456, 115 C. C. A. 358.

Henry Craft, of Memphis, Tenn., for complainant.
L. G. Fant, of Holly Springs, Miss., for defendant.

NILES, District Judge. Complainant's bill filed in this cause alleges that defendant, the Bank of Holly Springs, had heretofore sued the New York Central & Hudson River Railroad Company (hereinafter called the Railroad Company) in the circuit court of Marshall county, Miss., for the value of 200 bales of cotton, alleged to have been taken and carried by the Illinois Central Railroad Company from Holly Springs, Miss., to the point at which it was delivered to the complainant for carriage to New York City, its destination, where it was alleged complainant refused to deliver said cotton to the Bank of Holly Springs (hereinafter called the bank), notwithstanding the Bank presented bills of lading covering the said cotton and demanded delivery; that the value of the said cotton was $15,000; that the Bank was the holder for value and in due course of trade of said bills of lading covering the said cotton. The bill further alleges that this said suit was removed from the said circuit court of Marshall county, on petition of the Railroad Company, upon the ground of diverse citizenship, to the United States Circuit Court for the Western Division of the Northern District of Mississippi, on the law side thereof.

Subsequently the bill in this cause was filed as an original bill to enjoin the prosecution of the said suit at law, and to require the bank to come into this cause, and by cross-bill set up its claim to the said cotton, in order that the Railroad Company might, by answer to such cross-bill, set up its defenses, not pleadable at law. A writ of injunction was issued, restraining the Bank from any further prosecution of its suit at law, and requiring it to set up its claims by cross-bill in this cause. Whereupon the bank filed its answer and a cross-bill, and the Railroad Company answered the Bank's cross-bill, denying liability.

From this record in this cause, it appears: That Steel, Miller & Co., of Corinth, Miss., were engaged in buying and shipping cotton on a large scale, and had been so for some years, maintaining an office at Holly Springs, Miss., and in the years 1909 and 1910 in charge of one E. E. Hughes as their agent. That the bank agreed to finance their purchases of cotton at Holly Springs and vicinity during the cotton season of 1909–10, under the following arrangement:

The agent of Steele, Miller & Co. at Holly Springs, was to buy cotton brought in by wagon and have it placed in the warehouse of the Grenada Compress Company at Holly Springs, upon which compress warehouse receipts were to be issued to the sellers. These compress receipts were to be attached to a check drawn in the name of Steele, Miller & Co., by their agent, on the Bank of Holly Springs, payable to the sellers, and when presented to the Bank, if the number of bales of cotton was covered by receipts, the Bank would pay the check so drawn and hold the receipts as collateral security for the amount of the check. The said agent of Steele, Miller & Co. was also to buy cotton in neighboring towns and have it shipped to Holly Springs and delivered to the compress. Upon such cotton coming in by rail, bills of lading were issued at the shipping point to shipper's order, and these were attached to drafts drawn by the sellers of such cotton on Steele, Miller & Co. at Holly Springs. To pay these drafts, the said agent at Holly Springs would draw his check on the Bank, attaching thereto the said bills of lading which had accompanied the draft. The bank would then pay the checks, at the same time delivering the said bills of lading to the said agent, who would immediately take same to the compress and exchange them for warehouse compress receipts. These receipts were then turned over to the Bank, to be held by it as security for the money paid on the checks to which the bills of lading were attached. By this system the Bank always held compress warehouse receipts covering cotton regarded by the Bank as of ample value to protect it in its advances to Steele, Miller & Co.

Pursuant to this arrangement, and never deviated from in the entire course of business relations between the parties, on April 11, 1910, the agent of Steele, Miller & Co. notified the Bank that, upon instructions from his firm, he wished to ship out 200 bales of cotton, and requested the Bank to deliver him compress receipts covering a like number of bales, in order that he might surrender same to the compress company and obtain therefrom what is called a "clearance" for such 200 bales as he desired to ship. A clearance is understood to be a

notice in writing from the compress company to the railroad company, to the effect that the cotton therein described was in the compress warehouse in the name of Steele, Miller & Co., and would be shipped in accordance with statements therein as to shipper, consignee, marks, routing. destination, etc.   Thereupon the Bank, in response to this request of Steele, Miller & Co.'s agent, on April 11, 1910, delivered to their said agent, for the purpose heretofore mentioned, compress receipts covering 200 bales of cotton, taking the receipt of the said agent therefor, who then surrendered the receipts to the compress company and received from it the clearance.   This compress clearance was then taken to the office of the Illinois Central Railroad Company at Holly Springs. whose agent, upon the faith of the compress clearance, issued two bills of lading under date of April 11, 1910, to shipper's order, each covering 100 bales of cotton.   The marks of the cotton in one were "A S T U" and in the other "A S O N," branded "STEELE," with the notation on the face of each, "Notify S. M. Weld & Co., 82 Beaver street, N. Y."

On the same day, April 11, 1910, Steele, Miller & Co.'s agent delivered to the Bank two drafts drawn by Steele, Miller & Co. on Steele, Miller & Co., at Corinth, Miss., respectively for $7,920.63 and $7,622.18, to which were attached the two bills of lading heretofore mentioned as issued by the Illinois Central Railroad Company, under date of April 11, 1910.   As stated, the said bills of lading had been obtained in exchange for the compress warehouse receipts covering 200 bales of cotton which the Bank had surrendered to Steele, Miller & Co.'s agent, at his request, and for the express purpose of enabling him to make a shipment of the said cotton.   It may be stated that the Grenada Compress Company operated its business under what is known as the "block system," under which it is impossible to know with any degree of certainty whether or not the compress receipts surrendered to obtain the said bills of lading were the identical receipts covering the cotton mentioned in the said bills of lading.

The Bank immediately credited on its books the account of Steele, Miller & Co. with these drafts and forwarded same for collection with the said bills of lading attached.   On presentation of the drafts at the main office of Steele, Miller & Co. at Corinth, payment of same was refused, and the drafts, with the attached bills of lading, were returned to the Bank.   As stated, the said bills of lading were drawn to shipper's order—that is, to the order of Steele, Miller & Co.—and were not indorsed by Steele, Miller & Co., nor their agent at Holly Springs, when delivered to the Bank, nor did they bear indorsement until after the dishonored drafts of Steele, Miller & Co., to which said bills of lading were attached, had been returned from Corinth, when the said bills of lading were indorsed: "Steele, Miller & Co., by E. E. Hughes, Agent."

Meanwhile the cotton had gone forward and reached New York over the line of the New York Central & Hudson River Railroad. Thereupon the bank presented the bills of lading held by it to the Railroad Company, and was advised by it that other bills of lading had been presented by S. M. Weld & Co., covering the 200 bales, and de-

clined to deliver the cotton on the Bank's bills of lading, but delivered the cotton to Weld & Co. on the bills of lading presented by Weld & Co. It is admitted that the bills of lading upon which Weld & Co. secured the cotton are fraudulent and fictitious, and that those held by the Bank are the genuine original bills of lading covering the cotton involved in this suit.

Steele, Miller & Co., about this time, were discovered to be hopelessly insolvent, to the extent that their liabilities over assets ran into the millions; that they were in fact guilty of such criminal practices in the conduct of their business that the entire membership of the firm were convicted of such, and are now inmates of the federal penitentiary at Atlanta, Ga.

The Bank contends for its right to recover the value of the cotton from the Railroad Company, and that its refusal to deliver the cotton is a conversion, and that it is a bona fide holder, for valuable consideration, of the two original and genuine bills of lading issued by the Illinois Central Railroad for the said cotton. The Bank, by its cross-bill, prays that complainant pay it the value of said cotton, to wit, $15,000, with interest at 6 per cent. per annum from date of conversion, and that out of the value of the said cotton and the interest thereon it be allowed the balance of its debt, together with a reasonable attorney's fee, and all the expenses and court costs of this litigation; the balance, if any, to be paid over to the trustee in bankruptcy of Steele, Miller & Co., to be applied to the debts of said Steele, Miller & Co.

[1, 2] The Railroad Company denies conversion of the cotton in question, and relies upon its delivery to S. M. Weld & Co. as being the lawful owner of same, and therefore a good delivery, and a sufficient answer to the claim of the Bank. The Railroad Company claims the right to set up in its own defense any and all rights and equities which S. M. Weld & Co. had in and to said cotton, contending that if Weld & Co. were entitled to the cotton, legally or equitably, the delivery to them was not wrongful, and for this reason the bank could not be heard to complain.

S. M. Weld & Co. is a partnership, the members of which are residents of the state of New York, and had been engaged in business in that city as cotton buyers and brokers for several years prior to 1910, during which time they had transacted business with Steele, Miller & Co. On March 21, 1910, Steele, Miller & Co. drew its draft for $38,-572.70, from Corinth, Miss., upon the firm of Weld & Co., and attached thereto several alleged railroad bills of lading covering cotton. Among said bills of lading there were two bills of lading professing upon their face to have been issued by the Illinois Central Railroad Company, through its agent, J. H. Pinkston, at Holly Springs, Miss., dated March 18, 1910, each being a shipment order bill of lading, acknowledging receipt from Steele, Miller & Co. as shippers of cotton therein described. One of said bills of lading covered 100 bales of cotton marked "A S O N," and the other 100 bales of cotton marked "A S T U." Each 100 bales of cotton, according to the description contained in the bill of lading, were also branded "STEELE." Each

bill of lading also contained the following: "Notify S. M. Weld & Co., 83 Beaver street, New York, New York." The indorsement of Steele, Miller & Co. upon each of said bills of lading is the genuine indorsement of that firm.

S. M. Weld & Co., upon the faith and security of the two said bills of lading and the other bills of lading attached to said draft, did in good faith and without any notice whatever of any irregularity in the transaction on March 23, 1910, pay the draft of Steele, Miller & Co. for $38,673.70, of which amount $15,308.20 was paid upon the faith and security of the 200 bales of cotton professed to be covered by the said two bills of lading, marked "A S O N" and "A S T U." The said 200 bales of cotton, so marked and branded, were carried to the city of New York and placed with the German-American Stores in that city about April 25, 1910, that being a storage warehouse wherein the New York Central & Hudson Railroad Company was in the habit of storing its cotton shipments. S. M. Weld & Co. were notified by the Railroad Company of the arrival of the cotton as described in the bills of lading, and on April 29, 1910, Weld & Co. presented the said bills of lading to the Railroad Company and demanded the delivery of the said cotton before the presentation to it of any other bills of lading covering cotton of like mark and description. Between April 29 and May 3, 1910, the said 200 bales of cotton were delivered by the Railroad Company to Weld & Co.

Before the delivery of the said cotton Weld & Co. knew that trouble had arisen over Steele, Miller & Co.'s cotton shipments, and that it was claimed that there were duplicate bills of lading outstanding covering some of their shipments, and that the Bank of Holly Springs claimed to hold bills of lading covering this 200 bales in question; the Bank claiming to hold the genuine bills of lading, and that those which had been presented by Weld & Co. were forgeries. Attached to the said drafts which were paid by Weld & Co. was an invoice describing the cotton. The amount paid by Weld & Co. on said drafts upon the security of the 200 bales of cotton marked "A S T U" and "A S O N" was $15,308.20, or 15.21 cents per pound on 100,648 pounds. S. M. Weld & Co. had no other security for the money paid on said draft, other than the cotton supposed to be covered by the bills of lading, and the said draft was paid on March 23, 1910, in the regular and usual course of business, and Weld & Co. have been repaid no part of said money on said draft, or any interest thereon.

The Railroad Company delivered the 200 bales of cotton marked "A S T U" and "A S O N" to Weld & Co. at New York upon the surrender of the alleged bills of lading heretofore referred to, and the said bills of lading were then stamped canceled by said railroad; 182 bales of cotton had been delivered before any bills of lading were presented by the Bank of Holly Springs, but were still in the German-American Stores, as the property of Weld & Co., when the bills of lading held by the Bank were presented. The Railroad Company instituted replevin proceedings to recover these 182 bales, so that the respective claimants could intervene in such suit and settle the question of ownership; but subsequently Weld & Co. gave to

the Railroad an indemnifying bond to hold it harmless as between it and the Bank of Holly Springs, and said cotton was abandoned. After such bond was given, the other 18 bales of cotton were delivered to Weld & Co.

Complainant, having admitted the bills of lading upon which it delivered the cotton to Weld & Co. were fraudulent and fictitious and have no effect because they were forgeries, nevertheless contends they were valid and enforceable contracts, as between Steele, Miller & Co. and Weld & Co., to deliver the cotton to Weld & Co., thereby rendering Weld & Co. the true and lawful owners, unless the Bank have a superior title thereto, and the Bank must prove such superior title, and only as it proves its superior title to that of Weld & Co. can it complain of the delivery to Weld & Co. In support of complainant's contentions that Weld & Co. had a superior title to the cotton it is urged that the Bank is unable to identify a single bale of cotton covered by the bills of lading which it holds, and therefore its securities, by such loose methods of business pursued by the Bank, were so "swapped about and exchanged" as to place the record title and ownership of the 200 bales of cotton in Steele, Miller & Co., subject to the equities of Weld & Co. and of the Bank, and that the question resolves itself as to which party had the better equitable claim or lien.

In discussing this question, counsel for complainant starts out with the proposition that Steele, Miller & Co. were originally vested with the title to all the cotton stored in the compress warehouse for which compress receipts had been issued, because the Bank never claimed any interest in any of the cotton except as pledgee of the compress receipts. Therefore if the Bank was pledgee, Steele, Miller & Co. were the pledgors, and a pledge presupposes ownership and title. Continuing, if Steele, Miller & Co. owned the 200 bales of cotton to start with, they continued to own it, subject to the right of the Bank as pledgee of the compress receipts, and just when the receipts were pledged to the Bank does not appear, and further it was not shown that one bale of the 200 bales of cotton covered by the bills of lading was ever covered by a compress receipt. We do not think, even as the proposition is thus stated, the premises justify the conclusion; but under the proof the premises are not correct, as Steele, Miller & Co. were not vested with any title to the cotton, except that charged with the purchase money advanced by the Bank.

As to the charge of the "looseness" and unbusinesslike methods of the Bank in the conduct of its business with Steele, Miller & Co., the proof is conclusive that it was the reverse, as will be recalled from the testimony, nowhere contradicted, of the Bank's president, who states that during the cotton season of 1909–10 not a dollar was advanced to purchase cotton without receiving compress receipts therefor, that 5,975 bales were bought that season by Steele, Miller & Co., and that he received compress receipts calling for 5,975 bales. The most careful surveillance was maintained in all the transactions with the firm of Steele, Miller & Co., amounting to such a high degree of care as to indicate a certain uneasiness, if the ex-

treme limit of watchfulness was not constantly adhered to. Especially was this extreme care exercised when a shipment of cotton was to be made. As to the compress receipts covering the identical cotton called for in the bills of lading held by the Bank for the cotton in question, involving the use of the "block system," there is no merit in complainant's attack upon it.

It is clear even at this point of the discussion that the Bank had the better equitable claim to the cotton. In addition, however, the Bank received genuine bills of lading procured by Steele, Miller & Co.'s agent, who transferred same to the Bank (it matters not whether indorsed or unindorsed, as the intention was patent) in due course of business, in an open and above-board manner, which operated effectually as a legal transfer of the cotton, and vested the Bank with full title thereto. Where does the equity of Weld & Co. appear? Upon what basis can they come into court as against the Bank? They come with forged and fictitious bills of lading covering cotton which had been paid for by the Bank under time-honored and established methods of business, under all the safeguards known to successful banking and compress methods, with all the indicia and ownership of the cotton, and so recognized by Steele, Miller & Co.

Can it be imagined that a forgery of title to something not in being can pass a superior title to that of a genuine transfer of a thing itself? Weld & Co. were simply swindled by this trio of criminal bankrupts composing the membership of the firm of Steele, Miller & Co., and induced, by artful means, to part with their money. Can there be any semblance of justice in protecting the parties swindled in this transaction at the expense of those who knew nothing, nor suspected anything, of the agreements and contracts between their customers and others thousands of miles away? Would it not be still a greater hardship to compel the Bank to carry the burden when such contracts were bald forgeries? Banks have neither the time nor facilities to investigate the genuineness of bills of lading, or the contracts between their customers residing in other states, and to hold them (the Bank) for fraud and mistakes of shippers would utterly destroy the negotiability of drafts and bills of lading attached. Lewis v. W. H. Small & Co., 117 Tenn. 153, 96 S. W. 1051, 6 L. R. A. (N. S.) 890, 891, 119 Am. St. Rep. 994.

[3] Bills of exchange and promissory notes are representatives of money, circulating in the commercial world as such, and it is essential to enable them to perform the particular functions that he who purchases them should not be bound to look beyond the instrument, and that his right to enforce them should not be defeated by anything short of bad faith on his part. But bills of lading answer a different purpose and perform different functions. They are regarded as so much cotton, grain, iron, or other articles of merchandise, in that they are symbols of ownership of the goods they cover. Friedlander v. T. & P. R. R. Co., 130 U. S. 416, 9 Sup. Ct. 570, 32 L. Ed. 991.

[4] Complainant's counsel, admitting the bills of lading held by Weld & Co. to be forgeries, nevertheless insists that they must be

treated, as between Steele, Miller & Co. and Weld & Co., as genuine, and must be governed by the same rule of law. Upon this basis an elaborate argument is advanced, supported by authorities, the weight of which is unquestioned. It can be readily admitted that, treating the forged bills of lading as genuine as between Steele, Miller & Co. and Weld & Co., they might be treated as a sale. The question of fact as to whether in any given case the title to the goods themselves was intended to pass by this symbolic delivery, the language of the written instrument and the nature and character of the contract would be considered, together with an accompanying invoice, and where the title is thus made evident no particular forms or formalities are called for.

Counsel deduces from the foregoing that, if the bills of lading originally forwarded to Weld & Co. by Steele, Miller & Co. had been genuine, and backed by cotton already delivered to the Railroad Company, payment of the drafts accompanying them by Weld & Co. would, as against Steele, Miller & Co. and all the world, excepting only persons having a title paramount to that of Steele, Miller & Co., have vested in Weld & Co. the title to the cotton, and an enforceable right to have the cotton delivered to them or their order by the transporting railroad company. Does a proper determination of the rights of the Bank against the Railroad Company in behalf of Weld & Co. depend upon the hypothetical proposition of what might be, or not be, had Steele, Miller & Co. been honorable traders, instead of commercial bushwhackers?

Neither does it assist in the consideration of this case that the federal courts have declared that bills of lading have a twofold character: (1) A receipt; and (2) contract to carry—and upon this to predicate that Steele, Miller & Co. appropriated, under the false bill of lading, the ownership of the cotton to Weld & Co. Complainant's counsel, proceeding in his argument, states that it has been held by the federal courts that when a bill of lading is issued by a railroad company's agent, without the receipt of the goods described, and the goods are thereafter delivered to the railroad company under circumstances evincing an intention to appropriate them to the bill of lading formerly issued, the title to the goods passes to the lawful holder of such bill of lading immediately upon the delivery of the goods to the carrier, so that the holder of the bill of lading can compel their delivery by the carrier; and, bearing upon the intention to subject and appropriate the goods thus subsequently delivered to the bill of lading, the court will consider invoices issued by the shipper, marks placed upon the cotton by the shipper, and other similar circumstances.

Counsel cites, among other authorities in support of the proposition preceding, the case of Hentz v. The Idaho, 93 U. S. 575, 23 L. Ed. 978, which he regards as so applicable to the facts of this case as to quote in extenso. We have carefully read this authority and fail to see wherein the facts resemble those of the case at bar. The principle of law is compelling, but fortified by the fact that genuine bills of lading are treated of, and bills signed by the carrier's agent. In

the case at bar the rights of Weld & Co. are based upon false, fraudulent, and fictitious bills of lading, and, in our opinion, counsel has builded his house upon the sands.

We do not deem it necessary to follow counsel further in the argument, in view of the court's position as advanced. Aside from those fraudulent and fictitious, the law as to the negotiability and transfer of genuine bills of lading has been the subject of endless discussion; but we think it well established that, for many purposes, bills of lading are representatives of the goods shipped, and the title to the goods, while they are in the possession of the carrier as bailee, may be transferred by the owner by means of transfer to a third person. This is the sense in which a bill of lading is said to be a negotiable instrument, but not in the same sense negotiable as promissory notes or bills of exchange; for the latter stand for money, which passes by delivery, by which the person receiving it gets a good title if acting in good faith, while the delivery of goods in general passes to the person receiving them no better title than that of the one from whom they are received. Shaw v. St. Louis Merchants' Nat. Bank, 101 U. S. 557, 25 L. Ed. 892. It follows, then, that the transferee of a bill of lading has no higher title to the goods represented by it than the person by whom the transfer is made. National Commercial Bank v. Lackawanna Transp. Co., 59 App. Div. 270, 69 N. Y. Supp. 396; Shaw v. St. Louis Merchants' Nat. Bank, 101 U. S. 557, 25 L. Ed. 892.

It is thus seen that in a general sense a bill of lading is negotiable, in that it may be transferred as representing goods. Moore v. Robinson, 62 Ala. 537; Nicholson v. Conner, 9 Daly (N. Y.) 275; Shaw v. St. Louis Merchants' Nat. Bank, 101 U. S. 557, 25 L. Ed. 892; Munroe v. Philadelphia Warehouse Co. (C. C.) 75 Fed. 545; United States v. Delaware Ins. Co., 4 Wash. 418, Fed. Cas. No. 14,942. And the transfer of the bill of lading is not a transfer of the contract itself, but it is only a transfer of the goods represented by it. Cox v. Central Vermont R. Co., 170 Mass. 129, 49 N. E. 97; Falkenburg v. Clark, 11 R. I. 278. The foregoing applies to genuine bills of lading, and from these principles it follows that, if the bill of lading is fictitious—that is to say, it does not represent any goods —then the transferee acquires no right under the transfer. Southern Express Co. v. Tupelo Bank, 108 Ala. 517, 18 South. 664; Jasper Trust Co. v. K. C. R. R. Co., 99 Ala. 416, 14 South. 546, 42 Am. St. Rep. 75; Maybee v. Tregent, 47 Mich. 495, 11 N. W. 287; Tupelo Bank v. K. C. R. R. Co. (Miss.) 16 South. 572.

[5] In the case at bar, Weld & Co. parted with their money on the faith of fictitious bills of lading, representing no cotton, and consequently acquired no rights; on the other hand, the Bank held the genuine bills of lading representing the actual cotton, lawfully possessed by it, coming into its hands for a valuable consideration in due course of business, without the slightest suspicion of irregularity, and its claim to ownership firmly established. Weld & Co. in consequence, have no sort of claim, legal or equitable, to the cotton in controversy. This being so, the refusal of the Railroad Company

to deliver the cotton to the Bank was a conversion, and it became liable to the Bank for the value of the cotton, to wit, $15,000, to which is to be added 6 per cent. interest per annum from the date of conversion, together with the costs herein.

We come now to the question of attorney's fees. Being of the opinion, as herein expressed, that the Railroad Company is liable for the conversion of the cotton in question by its refusal to deliver same on the genuine bills of lading held by the Bank, to the full value of the cotton, with interest from date of conversion, the matter of attorney's fees can in no wise affect the Railroad Company, as the Bank could not, nor does it, ask the Railroad Company to pay its attorney's fee. Certainly it is well established by the federal decisions that attorney's fees are not recoverable as part of the damage for conversion or of trover; but, as stated, the Bank neither asks nor expects the losing litigants to pay the attorney's fees in this cause, but that it may be allowed out of the surplus of the recovery remaining after its debt is paid, the balance in its hands to be subject to the general creditors of Steele, Miller & Co.

The authorities sustain the Bank in this contention. "The pledgee has a lien on the property for every expense, including the attorney's fee, reasonably incurred by him in keeping and caring for the property pledged, protecting it against liens, taxes, and assessments, or otherwise protecting the pledgor's rights, in making sale for the enforcement of the pledge, in collecting choses in action, and other expenses incurred in rendering the pledged property available for the payment of his debt, although not for any expenses incurred by reason of his own wrongful act." 34 Cyc. 826, with authorities cited. By long-established mercantile usage, certain classes of bailees, such as banks and factors, have a general lien on the balance of the account for all property of the debtor pledged to them for the particular obligation. 31 Cyc. 821, with authorities cited. Under the facts and the law controlling in this case, the Bank should be allowed an attorney's fee, to be paid out of the value of the said cotton, and interest thereon. In this case, an attorney's fee of $1,125 would seem to be a reasonable one.

A decree should be entered directing the New York Central & Hudson River Railroad Company to pay the Bank of Holly Springs the value of said cotton, $15,000, with interest at the rate of 6 per cent. per annum from the date of its conversion; that the injunction heretofore granted in this cause be dissolved, and that out of the value of said cotton and the interest thereon the Bank of Holly Springs be allowed the balance of its debt, to wit, $11,025.97, with interest from August 1, 1910, at 8 per cent., together with an attorney's fee of $1,125; the balance, if any there be, to be paid over to the trustee in bankruptcy of Steele, Miller & Co. to be applied to the claims of the general creditors of the said Steele, Miller & Co.