## COUNTY OF HAMPDEN, SEPTEMBER TERM 1867, AT SPRINGFIELD.

PRESENT:

HON. GEORGE T. BIGELOW, CHIEF JUSTICE.
HON. EBENEZER R. HOAR,
HON. REUBEN A. CHAPMAN,
HON. HORACE GRAY, JR.,
HON. DWIGHT FOSTER, } JUSTICES.

---

EDWARD H. BUCKLAND & another *vs.* ADAMS EXPRESS COMPANY.

One whose business is for hire to take goods from the custody of their owner, assume entire possession and control of them, transport them from place to place and deliver them at a point of destination to consignees or agents there authorized to receive them, is a common carrier, although he styles himself an express-forwarder, and although he contracts with others to transport the goods in vehicles of which they are the owners and the movements of which he himself does not manage or control.

A. & B., copartners, bought goods at a factory, and left them in charge of a workman of the manufacturers to be delivered there to C., a common carrier; but they gave no authority to the workman to make a special contract with C. for their transportation. C. there received them and gave to the workman a receipt therefor, the terms of which purported to limit his liability as a common carrier. It had been the daily practice of C., for several weeks previous, to receive packages at the factory from the manufacturers, and give similar receipts therefor. A. was the bookkeeper of the manufacturers and had charge of these receipts. C. at these visits to the factory had as often as twice a week received packages from A. & B., for which one quarter of the time he had given similar

receipts, not giving receipts at all the rest of the time. *Held*, that these facts do not show that A. & B. assented to any restriction on the liability of C. as a common carrier of the package delivered by the workman.

CONTRACT to recover the value of a case of pistols. In the superior court judgment was entered for the plaintiffs on agreed facts ; and the defendants appealed to this court.

1. The facts agreed as to the general capacity of the defendants as common carriers were as follows : " The defendants, in all their advertisements, placards, notices and receipts, designate themselves simply as an express company and express-forwarders. They have established in most of the cities and large towns in certain sections of the country offices and agents, and it is made the duty of the agents, among other things, to receive packages to be sent to different parts of the country where the defendants have other offices established, or to the lines of other express companies, as the destination of such packages may require. These packages the defendants receive and undertake for hire to transmit in the care of their own messengers, and in the manner herein stated, to the points of their destination, as far as their routes extend, and the messengers of the defendants accompany them on said routes in the vehicles by which they are carried. To these offices are also sent the packages consigned to persons living in their immediate locality, where they are distributed to the consignees, either at the office of the defendants or at the place of business or residence of the consignee, as the case may be, by the employees of the defendants, from their carts and wagons. The defendants also undertake and are employed to transmit business orders, to demand and collect notes and accounts and to transmit intelligence, so far as the same may be properly done without violation of the postal laws. The defendants have entered into contracts with certain railroads, steamboats and stage companies and other public carriers doing business within the same parts of the country, to receive on their conveyances such packages and freight as the defendants may, from time to time, wish carried by them, and also such messengers as the defendants may wish to send with said freight, and for this service these public carriers are

paid by the defendants amounts depending upon the space agreed to be furnished for occupation by said carriers, which upon the railroads is usually a portion of the baggage car. The defendants have not generally the exclusive occupancy of that part of these conveyances occupied by them, but part of the same car in which their freight is placed is often occupied with the baggage of passengers on the train, with other freight, and by the employees of the railroad. The public convenience and the safety of the passengers make it necessary that the persons in charge of the railroad trains, steamboats and stages, should have access to all parts of these conveyances. The defendants have no control over the movements of the trains of cars, steamboats or stages, transporting the freight intrusted to them. Said freight is carried to and from their offices to the depots in wagons owned by and under the control and direction of the defendants, and is for the most part delivered from the same to the consignees on arrival at its place of destination."

2. The facts agreed as to the package, to recover the value of which this action was brought, were as follows : " The plaintiffs knew, at and before they intrusted to the defendants the package hereinafter mentioned, that it was to be transported in the manner and under the arrangement above described. On January 23, 1866, they delivered to the defendants at Springfield, Massachusetts, a case of pistols to be forwarded by them to Theodore Eagle & Co., Vicksburg, Mississippi. While on its way to Vicksburg, in the custody of the defendants, a steamer in which it was being forwarded was destroyed on the Mississippi River by the explosion of its boiler, and the goods were thereby lost. The steamer was not under the control of the defendants, and the goods were sent by the ordinary method and route of transportation. The case of pistols was originally received by a teamster of the defendants at the manufactory of Smith & Wesson in Springfield, where the plaintiffs purchased it. Neither of the plaintiffs was present at the time. It was delivered by a workman of Smith & Wesson who had authority from the plaintiffs to deliver it to the defendants, but no author ity was given to him to make a special contract for its transporta-

tion unless such is implied from the circumstances herein stated. At the time the case was taken the teamster gave to the workman a receipt and took a bill of the goods and price to be collected on delivery. For some weeks previous to January 23, the plaintiffs had been engaged in purchasing pistols from Smith & Wesson and selling them in different parts of the country It was the practice of the defendants' teamsters to call daily at the manufactory of Smith & Wesson, which was also the plaintiffs' place of business, and receive such packages as Smith & Wesson wished to send by them, and as often as twice a week for several weeks previous to January 23, the plaintiffs gave to the teamster other similar packages to be carried by the defendants to different parts of the country. It was the uniform practice of the teamster to deliver to Smith & Wesson; and, about one quarter of the time prior to this instance, and whenever any receipt at all was given, to the plaintiffs or their agents, receipts, the printed parts of which were duplicates of the one given in this instance, and the written parts of which differed only in the dates and address. The teamster had no authority to give any other receipt or make any other contract for transportation. One of the plaintiffs was at that time, and long previously had been, the bookkeeper of Smith & Wesson, and had charge of the safe keeping of the receipts given to them as aforesaid similar to the one in this instance; and at no time did the plaintiffs express to the defendants any desire that their goods should be carried on any different terms than those expressed in the receipt or make any expression whatever of their desire upon the subject. The defendants, when first informed of the loss and the claim made by the plaintiffs, declined, through their superintendent, to pay the same, and stated that ' under the terms of our receipt which exonerates us from the dangers arising from river navigation and steam, we must decline responsibility for the loss,' and alleged no other reason."

It was not disputed that if, on these facts, it should be adjudged that the plaintiffs assented to the terms of the receipt, its limitations of the defendants' liability as common carriers are such as exempt them from responsibility for the loss.

*H. Morris*, for the plaintiffs.

*G. Wells*, (*N. A. Leonard* with him,) for the defendants. The defendants differ from common carriers, in essential particulars. The goods sent by them are not transported in conveyances of which they are owners or masters. They have no control or management of the railroad cars or steamboats. The full extent of their option is to select means of conveyance which apparently are safe and well managed and to avoid those that are not. All that can be required of them in this direction is ordinary care. They do not hold themselves out to the community as common carriers, but simply as express forwarders. *Roberts* v. *Turner*, 12 Johns. 232. Public necessity requires the express business of the country to be carried on by the instrumentality of public conveyances owned and operated by other parties than the express companies. In employing these, the express companies do not make them their agents for whose acts they, as principals, are responsible. *Sproul* v. *Hemmingway*, 14 Pick. 1. *Blake* v. *Ferris*, 1 Selden, 62. *Hilliard* v. *Richardson*, 3 Gray, 349. To engraft upon the contract which the defendants make with their patrons, the contract which the law imposes upon the common carrier, would impose impossibilities upon them, and make them responsible when they could not be at fault. 5 Am. Law Reg. (N. S.) 448, 513. The public interest does not require such a liability. 5 Am. Law Reg. (N. S.) 648.

The defendants could avoid their liability, either as common carriers or forwarders, by agreement. *Brown* v. *Eastern Railroad Co.* 11 Cush. 97. *Judson* v. *Western Railroad Co.* 6 Allen, 486. The receipt given by the defendants was not a general notice of their intention to avoid certain liabilities as in the case of *Judson* v. *Western Railroad Co. ubi supra*, but contained the terms on which they were willing to receive those goods; and the plaintiffs, by necessary implication at least, agreed to these terms. *Rowley* v. *Horne*, 3 Bing. 2. *Mayhew* v. *Eames*, 3 B. & C. 601. *Austin* v. *Manchester, Sheffield & Lincolnshire Railway Co.* 10 C. B. 454. *York, Newcastle & Berwick Railway Co.* v. *Crisp*, 14 C. B. 527. *Morville* v. *Great Northern Railway Co.* 10 Eng. L. & Eq. 366; 21 L. J. Q. B. 319. *Wyld* v. *Pickford*, 8 M. & W. 443.

BIGELOW, C. J. We are unable to see any valid reason for the suggestion that the defendants are not to be regarded as common carriers. The name or style under which they assume to carry on their business is wholly immaterial. The real nature of their occupation and of the legal duties and obligations which it imposes on them is to be ascertained from a consideration of the kind of service which they hold themselves out to the public as ready to render to those who may have occasion to employ them. Upon this point there is no room for doubt. They exercise the employment of receiving, carrying and delivering goods, wares and merchandise for hire on behalf of all persons who may see fit to require their services. In this capacity they take property from the custody of the owner, assume entire possession and control of it, transport it from place to place, and deliver it at a point of destination to some consignee or agent there authorized to receive it. This statement embraces all the elements essential to constitute the relation of common carriers on the part of the defendants towards the persons who employ them. *Dwight* v. *Brewster*, 1 Pick. 50, 53. *Lowell Wire Fence Co.* v. *Sargent*, 8 Allen, 189. 2 Redfield on Railways, 1–16.

But it is urged in behalf of the defendants that they ought not to be held to the strict liability of common carriers, for the reason that the contract of carriage is essentially modified by the peculiar mode in which the defendants undertake the performance of the service. The main ground on which this argument rests is, that persons exercising the employment of express carriers or messengers over railroads and by steamboats cannot, from the very nature of the case, exercise any care or control over the means of transportation which they are obliged to adopt; that the carriages and boats in which the merchandise intrusted to them is placed, and the agents or servants by whom they are managed, are not selected by them nor subject to their direction or supervision ; and that the rules of the common law, regulating the duties and liabilities of carriers, having been adapted to a different mode of conducting business by which the carrier was enabled to select his own servants and vehicles and to exercise a personal care and oversight of them, are

wholly inapplicable to a contract of carriage by which it is understood between the parties that the service is to be performed, in part at least, by means of agencies over which the carrier can exercise no management or control whatever. But this argument, though specious, is unsound. Its fallacy consists in the assumption that at common law, in the absence of any express stipulation, the contract with an owner or consignor of goods delivered to a carrier for transportation necessarily implies that they are to be carried by the party with whom the contract is made, or by servants or agents under his immediate direction and control. But such is not the undertaking of the carrier. The essence of the contract is that the goods are to be carried to their destination, unless the fulfilment of this undertaking is prevented by the act of God or the public enemy. This, indeed, is the whole contract, whether the goods are carried by land or water, by the carrier himself or by agents employed by him. The contract does not imply a personal trust, which can be executed only by the contracting party himself or under his supervision by agents and means of transportation directly and absolutely within his control. Long before the discovery of steam power, a carrier who undertook to convey merchandise from one point to another was authorized to perform the service through agents exercising an independent employment, which they carried on by the use of their own vehicles and under the exclusive care of their own servants. It certainly never was supposed that a person who agreed to carry goods from one place to another by means of wagons or stages could escape liability for the safe carriage of the property over any part of the designated route by showing that a loss happened at a time when the goods were placed by him in vehicles which he did not own, or which were under the charge of agents whom he did not select or control. The truth is that the particular mode or agency by which the service is to be performed does not enter into the contract of carriage with the owner or consignor. The liability of the carrier at common law continues during the transportation over the entire route or distance over which he has agreed to carry the property intrusted to him. And there is no good reason for

making any distinction in the nature and extent of this liability attaching to carriers, as between those who undertake to transport property by the use of the modern methods of conveyance, and those who performed a like service in the modes formerly in use. If a person assumes to do the business of a common carrier, he can, if he sees fit, confine it within such limits that it may be done under his personal care and supervision or by agents whom he can select and control. But if he undertakes to extend it further, he must either restrict his liability by a special contract or bear the responsibility which the law affixes to the species of contract into which he voluntarily enters. There is certainly no hardship in this, because he is bound to take no greater risk than that which is imposed by law on those whom he employs as his agents to fulfil the contracts into which he has entered.

It is not denied that in the present case the goods were lost or destroyed while they were being carried over a portion of the route embraced in the contract with the plaintiffs, and before they had reached the point to which the defendants had agreed to carry them. It is not a case where the agreement between the parties was that the merchandise was to be delivered over by the defendants to other carriers at an intermediate point, thence to be transported over an independent route to the point of destination without further agency on the part of the defendants. The stipulation was that the defendants should carry the property from the place where they received it to the point where it was to be delivered into the hands of the consignee. The loss happened before the defendants had fulfilled their promise.

The other question raised by the agreed facts is rather one of fact than of law. It is no longer open to controversy in this state that a common carrier may limit his responsibility for property intrusted to him by a notice containing reasonable and suitable restrictions, if brought home to the owner of goods delivered for transportation and assented to clearly and unequivocally by him. It is also settled that assent is not necessarily to be inferred from the mere fact that knowledge of such notice on

the part of an owner or consignor of goods is shown.   The evidence must go further and be sufficient to show that the terms on which the carrier proposed to carry the goods were adopted as the contract between the parties according to which the service of the carrier was to be rendered.   *Judson* v. *Western Railroad Co.* 6 Allen, 486–490.   On a consideration of the facts stated, it does not appear to us that the plaintiffs ever did agree that the merchandise in question should be transported on the terms set forth in the receipt which was delivered to the workman at the manufactory when the package was delivered to the defendants' agent.   It is not stated that the plaintiffs or either of them ever read the paper containing the alleged regulations or one similar to it.   It is agreed that the defendants received and carried like packages of merchandise for the plaintiffs at or about the time when the one in controversy was delivered for carriage without giving the plaintiffs any receipt whatever therefor, and that this was the course of dealing between the parties in a large majority of the instances in which the defendants had been employed by the plaintiffs.   From this it would appear that the ordinary course of business was for the defendants to receive merchandise from the plaintiffs without attempting to limit their liability as carriers in any manner whatever.   Under such circumstances we cannot fairly infer that the plaintiffs understood that by the delivery of a receipt for the merchandise the defendants intended to limit the liability which they ordinarily assumed in their dealings with the plaintiffs, or that the latter understood and assented to the contents of such receipt as fixing the terms on which the defendants were to transport the merchandise.                    *Judgment for the plaintiffs.*