Keniston, C. J.
The plaintiff seeks to recover in an action of contract or tort, from the defendant, a Massachusetts corporation, as a carrier, for the loss of goods in its possession resulting from a fire.
The defendant, at the time the loss occurred, was the holder of a certificate as a common carrier and of a permit as a contract carrier issued by the Interstate Commerce Commission. The defendant was also the holder of a certificate as a common carrier issued by the Massachusetts Department of Public Utilities. Prior to 1938 it was the holder of a permit to operate as a contract carrier in Massachusetts. Chapter 483 of the Massachusetts Act of 1938 required the reclassification of contract carrier permits. On April 12,1939, a hearing was held by the Massachusetts Department of Public Utilities upon the defendant’s application for reclassification under the 1938 Act. At this hear *386 ing the examiner made a notation that the defendant was to be issued a permit as a contract carrier upon the Department being supplied with copies of its contracts and a schedule of its customers.
On June 21, 1939, the .Department wrote the defendant the usual letter when a contract carrier permit was to be issued, asking, for copies of its contracts and a schedule of minimum rates and charges as a contract carrier in Massachusetts. On August 21, 1939, the Department wrote the defendant that such a list of customers must be submitted before the contract carrier permit would be issued. On June 21, 1941, the Department issued an order which required all applicants for permits as contract carriers to file with the Department on or before September 1, 1941, acceptable contracts and three copies of a schedule of minimum rates and charges. On August 28,1941, the defendant filed a list of customers but no copies of contracts or schedule of rates and charges. The list of customers contained about thirty names including the plaintiff. The carriage of freight for these customers represented a substantial business, and such freight had been carried by the defendant continuously to date on the same general terms and the same general manner as it had been carried by the defendant prior to 1938, that is at rates fixed by contract between the defendant and the customers which rates were different from the defendant’s common carrier rates. Up to the time of the loss on September 18, 1941, the defendant had not met the requirement of filing copies of contracts and a schedule of its rates and charges. However, the Department had taken no action against the defendant. Since 1938 up to the time the fire occurred, no contract carrier permit had been issued to the defendant by the Massachusetts Department of Public Utilities.
*387 The defendant had been carrying merchandise for the plaintiff from the piers at Boston to the warehouses of the plaintiff in Charlestown for over ten years prior to the fire. The contract of carrying had been oral. The rate charged at the time of the fire and currently was 5%^ per hundred pounds. This rate was substantially lower than the rate at which the defendant carried goods as a common carrier. The regular practice between the parties was for the plaintiff to notify the defendant of the arrival of a cargo of goods and to deliver to the defendant a bill of lading and a check for the steamship company. The defendant delivered the bill of lading and the check to the office of the steamship company which gave the defendant a duplicate bill of lading marked “paid”. The defendant presented the duplicate bill of lading at the pier and loaded the goods onto its trailers and signed receipts for the steamship company listing the goods. The goods were then carried in the trailers to the plaintiff’s warehouses and offices to which the defendant delivered the goods. The warehouses opened about 7:30 A. M. and closed at 4:15 P. M. Warehouses numbered 34 and 35, where the fire occurred, were part of the Charles-town warehouses. The goods in question were loaded and arrived at the warehouses or offices of the plaintiff in eight trailers, at different times between noon of September 17, 1941, and 5 P. M. on, September 18, except for one trailer which had arrived on September 10 and had been about two-thirds unloaded at the time of the fire. The fire occurred about 6:00 P. M., September 18, 1941, when the plaintiff’s warehouses were burned as well as the defendant’s trailers with their contents, resulting in a substantial loss.
There was evidence tending to show that the regular practice of the parties was as follows:
*388 "When the defendant loaded its goods into the trailers at the pier, the receipt from the steamship company was a “loading ticket” made out in triplicate by the driver of the defendant’s truck or trailer, who gave one to the steamship company at the pier and then carried the goods to the plaintiff’s warehouses at Charlestown. Upon arriving there the driver gave one copy to the plaintiff’s foreman at the warehouse and the third copy to the “lumper” who had charge of a crew of the defendant’s men who were stationed permanently at the plaintiff’s Charlestown warehouse for unloading purposes.
When the plaintiff’s foreman received his copy of the “loading ticket” he told the defendant the particular door of the particular warehouse where the goods in the truck or trailer were to be unloaded. The plaintiff had at least three large warehouses in Charlestown numbered 33, 34 and 35, respectively. There were some twenty-two loading doors, each of which accommodated two trailers at warehouse 35 alone. The defendant set the trailer or truck at the place specified by the plaintiff, or, if so instructed, the truck or trailer was set temporarily against the warehouse. The unloading of the trucks or trailers was a joint operation, the defendant’s men working in two man teams took the goods from the truck or trailer and placed them in delivery trucks or “dollies”. The plaintiff’s men working in four man teams inside the warehouses took the goods on their delivery trucks or “dollies” and stored the goods in the warehouses. At this time a receipt for the goods was signed by the plaintiff and given to the defendant. The defendant did not start unloading any truck or trailer until the plaintiff notified the defendant to do so and had its crew ready to store the goods.
The warehouses were very large and were very full. The plaintiff’s crew at the warehouses also unloaded *389 freight cars. Bach day the plaintiff notified the defendant of the number of men it desired the defendant to have on hand for unloading the following day and usually the defendant was able to supply the number of men requested. The actual practice followed with respect to the transportation of the destroyed goods was according to the usual practice.
On the day of the fire, the defendant had at least four men present. It took from one and one-half to two hours to unload a truck or trailer, depending upon its size and the nature of the goods. Pour men could have unloaded in one day, the eight trailers present on the day of the fire. The warehouses were sometimes kept open after the regular closing time and the defendant’s men were always glad to get overtime work. The warehouses closed at the regular time, 4:15 P. M. on the day of the fire.
The plaintiff seasonably filed seven requests all of which were allowed by the Court except requests numbered 5 and 6 which were as follows:
“5. The defendant’s status to the plaintiff’s goods at the time of their destruction was that of an intra-state common carrier of goods by motor vehicle.
“6. Without a contract carrier permit from the Commonwealth of Massachusetts, the defendant could not have the regular status of an intra-state contract carrier by motor vehicle in Massachusetts at the time of the destruction of the plaintiff’s goods.”
The Court denied these two requests, referred to its findings and found the following facts, “I find that as between the parties the defendant was a contract carrier; that there was no negligence on the part of the defendant. ’ ’ The Court found for the defendant.
The plaintiff’s appeal is based upon the denial of requests numbered 5 and 6.
*390 The plaintiff seems to concede, and there can be no question, that the Court was justified in finding on the evidence that there was no negligence on the part of the defendant. Moreover this question is not raised by either of the requests upon which this appeal is based. There is, therefore, no liability upon the defendant as a contract carrier. The plaintiff’s right to recover depends upon establishing that the defendant was acting as a common carrier in the transportation of the plaintiff’s goods.
Section 2 of Chapter 483 of the Acts of 1938 provides in substance that the Department of Public Utilities shall forthwith review all existing contract carrier permits previously granted under Chapter 159B and then in effect for the purpose of classifying the services as that of common carriers or contract carriers and, subject to the provisions of the section, shall issue without charge, certificates or permits, or both, to the holders of such existing contract carrier permits in accordance with the nature of the services performed and consistent with its findings. The same section defines in paragraph (a) and (b) the different kinds of certificates and permits to be issued to conform to the nature of the services performed by the carriers.
Paragraph (c) of the same section allows the holder of a contract carrier permit to apply within ninety days for a permit and that such permit shall be granted subject to the requirements of paragraphs (a) and (b) of that section and further provides that “Pending the issuance of such permit the applicant may operate as a contract carrier subject to the existing permit, upon compliance with section seven of said Chapter 159B as so appearing.” (.Section seven requires the filing of copies of the contracts in writing, lists of customers and schedules of rates.)
Paragraph (f) provides for a hearing for those existing *391 contract carriers who fail to make applications, paragraph (h) provides that the department shall revoke and cancel existing permits of those holders who wilfully refuse to appear at hearings or refuse to divulge the facts regarding the nature of their operations, and paragraph (i) provides that pending the decision of the department at such hearings, the holders of such permits may operate as contract carriers under the terms of the existing permits, upon compliance with section seven of Chapter 159B.
Although the defendant had been dilatory in complying with the requirements of filing the written contracts with its customers and its schedule of rates and had specifically failed to comply with the order of June 21,1941 to file these contracts and schedules before September 1, 1941, yet the department had taken no action against the defendant under Section 21 of Chapter 159B as appearing in Chapter 483 of 1938, nor had the department taken any steps to revoke and cancel the defendant’s prior permit as a contract carrier or to enjoin it from so acting. There would seem to be some doubt under these circumstances that the defendant was acting entirely without right as a contract carrier having no existing permit.
However, the parties in their briefs and arguments seem to have failed to consider this aspect of the case and to have dealt with the issues on the basis that the defendant had no valid existing permit. "We therefore consider the questions raised by this appeal on the same basis.
In Section 2 of Chapter 159B as amended by Chapter 483 of 1938, contract and common carriers are defined as follows :—
“ ‘Contract carrier by motor vehicle’ any person, not included in the term ‘common carrier by motor vehicle’ who, under special and individual contracts or agreements, di *392 rectly or by Ms agent or under a lease or any other arrangement, transports property by motor vehicle for compensation upon ways”,
“ ‘ Common carrier by motor vehicle’, any person who directly, or by his agent or under a lease or any other arrangement, or by arrangement with any other common carrier or with any contract carrier, transports property, or any class or classes of property, for the general public by motor vehicle, for compensation, upon ways, over regular or irregular routes, including carriers by rail or water and express or forwarding companies, when engaged in such motor vehicle operations, except to the extent that such operations by them are subject to Chapter one hundred and fifty nine”.
Ordinarily under our decisions the test of whether any particular carriage of goods is that of a common carrier or of 'a contract carrier depends upon what the carrier is doing, whether he is carrying the goods under an arrangement held out to the public generally or under a special arrangement with the particular shipper. Dwight v. Brewster, 1 Pick, 50, 53; Buckland v. Adams Express Co., 97 Mass. 124; Houle v. Lewonis, 245 Mass. 254; Goodman v. New York, H. H. & H. R. R., 295 Mass. 330, 333, 334; Short Line, Inc. v. Quinn, 298 Mass. 360; Smith v. Cahoon, 283 U. S. 553; Michigan Public Utilities Com. v. Duke, 266 U. S. 570, 577; Frost & Frost Trucking Co. v. R. R. Com. of Cal., 271 U. S. 583, 591. The distinction between common carriers and contract carriers as determined by these decisions does not seem to have been changed by the statutory definitions contained in Chapter 483 of 1938, at least so far as the issues in the present case are concerned.
The defendant had acted for several years as a contract carrier for the plaintiff until the passage of Chapter 483 of 1938. The same arrangement had continued since 1938 up *393 to the time the loss occurred with only one change, that of an increase in rates as of January 1, 1939, from 4% or 5 cents per hundred pounds to 5% cents per hundred pounds. This increased rate was less than the common carrier rate. The defendant did several things not ordinarily done by a common carrier in just carrying the goods. It paid the steamship company freight; it allowed the goods to remain in its trailers until the plaintiff wished them unloaded; it maintained a crew of men at the plaintiff’s warehouses, the number of men in the crew varying in accordance with the plaintiff’s request; it unloaded the goods in co-operation with the "plaintiff at times and places satisfactory to the plaintiff. While none of these acts alone would necessarily be conclusive, in determining the relationship, they were each of them significant and of some weight and taken together would at least support the Court’s, finding that the defendant was acting as a contract carrier.
The plaintiff however, contends that, the defendant having obtained a Massachusetts certificate as a common carrier and having failed to receive a permit as a contract carrier, the carriage of goods must as a matter of law be that of a‘common carrier.
This does not necessarily follow. Assuming the defendant was acting in violation of the provisions of the 1938 Act and could have been proceeded against under that Act by the Department of Public Utilities under the penalty section of the Act or restrained from so acting, it would have been no defense to the defendant to such proceedings to maintain that it was acting under its certificate as a common carrier when in facts its acts were those of a contract carrier.
The 1938 Act could not and did not change the business of the defendant as a contract carrier from that of a contract carrier to that of a common carrier. Commonwealth v. N. *394 E. Transportation Co., 282 Mass. 429, 435; Michigan Public Utilities Com. v. Duke, 266 U. S. 570 ; Frost & Frost Trucking Co. v. R. R. Com. of Cal., 271 U. S. 583, 591; Smith v. Cahoon, 283 U. S. 553.
Carrying the goods as a contract carrier would not make the carriage that of a common carrier merely because the carrier had a certificate as a common carrier but no permit as a contract carrier. The violation of the Act does not of itself change the character of the acts of the relationship of the defendant to the plaintiff. If the conditions had been reversed and the defendant had a permit as a contract carrier, hut no certificate as a common carrier, and was transporting goods as a common carrier, it could hardly expect to avoid its liability as a common carrier by claiming that its carriage must necessarily be that of a contract carrier.
Paragraph (k) of Section 2 of Chapter 483 of 1938 provides so far as material to the issues were involved that, “Contract carriers who are given the status of common carriers as a result of the review of contract carrier permits under this section shall forthwith become subject to section six of Chapter one hundred fifty nine B, as so appearing, and to the rules and regulations of the Department made thereunder.” (Section six of Chapter 159B applies to common carriers.)
The plaintiff contends that the defendant having been granted a certificate as a common carrier and not having received a permit as a contract carrier, its status as a common carrier attached to all of its business whether conducted as a common carrier or a contract carrier. It appears from the report that prior to the passage of Chapter 483 of 1938, the defendant had been both a common carrier and a contract carrier. After the passage of Chapter 483 of 1938 it had received a certificate as a common carrier. It had *395 been conducting a substantial business as a contract carrier both before and after the passage of the Act. Its business as a contract carrier before the passage of the Act had been continued by the defendant after the passage of the Act, although its application for a permit had not been granted by the Department. There is nothing in the report indicating that the Department of Public Utilities in granting a license to the defendant as a common carrier had determined that all of its business was so conducted. On the contrary, the report states that the Department had not, up to the time of the loss, granted the defendant’s application for a permit as a contract carrier and had asked the defendant to file its list of customers, contracts and rates. The defendant, under the Act could be both a common carrier and a contract carrier. It would seem to be a reasonable inference that the granting of the license as a common carrier applied only to the business of the defendant as a common carrier.
The failure to secure the permit in no way contributed to the fire. The loss would have occurred regardless of the relationship. The violation of law in failing to obtain the permit as a contract carrier would not of itself have been the cause of the damage to the defendant, Leveille v. Wright, 300 Mass. 382, 387; Farr v. Whitney, 260 Mass. 193; Stowe v. Mason, 289 Mass. 577, 583; nor would it have imposed a new obligation on the defendant not otherwise required by its relations with the plaintiff.
The analogies drawn by the defendant in cases relating to the operation of unregistered automobiles; the construction of a deed granting property to two parties by the entirety, where the parties are not husband and wife, as a deed to joint tenants; the sale of milk contrary to law; the unlicensed or illegal practice o law and medicine; violations of the Small Loans Act; and peddling without a li *396 cense, do not seem to be applicable or to be inconsistent with the conclusions above expressed. If the passage of the Act could not of itself make the acts of a contract carrier that of a common carrier (see Michigan Public Utilities Com. v. Duke, 266 U. S. 570 and other cases previously cited), the mere failure of the Department to act upon the defendant’s application for a permit as a contract carrier would not have that result.
The defendant is not prevented from claiming that it was a contract carrier so far as the plaintiff is concerned. It does not appear that the plaintiff had been affected in any way by the defendant’s failure to secure the permit as a contract carrier, nor that the plaintiff even knew that the defendant had failed to secure its permit. The prior relationship had continued after the passage of the Act as it had before except for the increase in rates which were, even after the increase, lower than the common carrier rates. Such increase was not made on the basis that the defendant was acting as a common carrier in transporting the plaintiff’s goods. It does not appear that the plaintiff in any way regarded the failure of the defendant to secure a permit as a contract carrier as establishing a common carrier relationship or in any way affecting the previous arrangement or that the plaintiff had in any way changed its position. The elements of estoppel are not present.
The Court was not compelled to find that the defendant was a common carrier and there was no error in denying either of the two requests.
Report dismissed.